STATE OF CONNECTICUT *v.* KEVIN TUCKER
(14446)

PETERS, C. J., CALLAHAN, BORDEN, NORCOTT and SANTANIELLO, Js.

Argued February 11—decision released July 27, 1993

*Deborah Del Prete Sullivan,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellant (defendant).

*Timothy J. Sugrue,* assistant state's attorney, and, on the brief, *Michael Dearington,* state's attorney, and *Elpedio Vitale,* assistant state's attorney, for the appellee (state).

CALLAHAN, J. A jury found the defendant, Kevin Tucker, guilty of the crimes of sexual assault in the first degree in violation of General Statutes § 53a-70 (a), kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) and assault in the second degree

in violation of General Statutes § 53a-60 (a) (1).[1] The court rendered a judgment of conviction upon the verdict. The defendant appeals[2] from that judgment, claiming entitlement to a new trial because the trial court improperly: (1) instructed the jury to draw a conclusive presumption; (2) complied only partially with a jury request to rehear testimony; (3) denied his motion for a mistrial; (4) denied his motions during jury selection to excuse certain venirepersons for cause and for an additional peremptory challenge; (5) sanctioned a nonunanimous verdict; and (6) instructed the jury concerning the standard of proof beyond a reasonable doubt. We affirm the judgment of the trial court.

The jury could have reasonably found the following facts. At approximately 5:30 a.m., on August 25, 1990, New Haven police officer Michael Quinn responded to a 911 emergency telephone call in which the caller reported having been awakened by "blood curdling screams" for help coming from the area of the Edge of the Woods store in New Haven. The caller also said that he had heard a woman pleading "Don't do it to me." Quinn drove behind the store, illuminated the area

---

[1] General Statutes § 53a-70 provides in relevant part: "SEXUAL ASSAULT IN THE FIRST DEGREE: CLASS B FELONY: ONE YEAR NOT SUSPENDABLE. (a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person . . . or by the threat of use of force against such other person . . . which reasonably causes such person to fear physical injury to such person . . . ."

General Statutes § 53a-92 provides in relevant part: "KIDNAPPING IN THE FIRST DEGREE: CLASS A FELONY. (a) A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ." See General Statutes § 1-1 (g).

General Statutes § 53a-60 provides in relevant part: "ASSAULT IN THE SECOND DEGREE: CLASS D FELONY. (a) A person is guilty of assault in the second degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person . . . ."

[2] The defendant appealed pursuant to General Statutes § 51-199 (b) (3).

with his spotlight and observed the defendant standing over the victim.[3] The defendant's trousers and underwear were lowered below his knees; the victim was "screaming hysterically." Quinn ordered the defendant to halt, but the defendant pulled up his pants and fled. Quinn exited the cruiser and pursued the defendant on foot. Because Quinn was familiar with the area and knew that an alley into which the defendant had run exited on Sherman Avenue, he decided not to scale fences but rather to run around the store so that he could intercept the defendant. Although Quinn had lost sight of the defendant for approximately thirty seconds before apprehending him, Quinn was certain that he had apprehended the person whom he had observed standing over the victim. Quinn walked the defendant to the rear of the store where the victim positively identified the defendant as the perpetrator of the assault.

Brian Donnelly, another New Haven police officer who had been dispatched in response to the 911 call, found the victim, slumped on the ground and crying hysterically, and summoned medical assistance and hospital transport for her. She had "massive injuries to [her] head," and her swollen and bleeding face had been beaten "almost . . . beyond recognition."

The defendant, a stranger to the victim, had followed her along Edgewood Avenue. He had then approached her, grabbed her hands, picked her up, carried her behind the store and thrown her to the ground. The victim had attempted to resist and the defendant had punched her in the face numerous times, choked her and threatened that he would kill her if she continued to resist and scream. The defendant had then ripped

[3] We do not identify the victim by name in compliance with General Statutes § 1-19 (b) (3) (E).

off the victim's slacks and underpants, had pulled down his own trousers and had forced the victim to engage in vaginal intercourse.

The medical and scientific testimony, based on observations of the victim and laboratory examinations of physical evidence, was consistent with these facts. On the morning of the incident, Margaret Alexander, a resident in obstetrics-gynecology at St. Raphael's Hospital, secured from the victim a history of the events that had resulted in her traumatic injuries, conducted a physical examination in order to locate evidence of trauma, laceration or assault, and proceeded through the Sirchie sex crimes kit protocol.[4]

Sanders Hawkins, the chief toxicologist at the state department of health services, conducted tests on clothing of the defendant and the victim. The defendant's T-shirt contained semen stains and his jacket contained traces of blood. The victim's jacket and shirt tested positive for traces of her own blood. The victim's vaginal and anal smears contained spermatozoa, and a vaginal swab taken from the victim contained seminal acid phosphatase.

I

The defendant first claims that the trial court improperly instructed the jury to draw a conclusive presumption and thereby removed from the jury's consideration an element of the offense of kidnapping in the first degree, in violation of the defendant's federal and state

---

[4] Alexander described the Sirchie sex crimes kit. "[It] comes in a cardboard box and it has 11 envelopes in it that you go into in sequence from collecting debris from the patient to hair samples, both pubic and from the head of hair and nail clippings, fingernail; then you collect specimens that are from the vaginal area, anal or oral area as well. The nurse also draws tubes of blood which go to the state lab and then the kit is sealed usually in a double envelope, each specimen, and the kit is then sealed with two safety stickers."

constitutional rights to a fair trial as guaranteed by the fifth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution.[5] In the course of its instructions, the trial court stated: "If the acts complained of were accompanied by the use of force or violence no further proof is required to establish the lack of consent on the victim's part." The defendant argues that the trial court's instruction relieved the state of the burden of proving the element of lack of consent.[6] The defendant did not object to the court's instruction at trial. We therefore analyze this unpreserved claim pursuant to *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[7]

"A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves cer-

---

[5] Although the defendant purports to rely on both the federal and state constitutions, he has failed to brief or analyze independently any state constitutional provision. Consequently, we limit our discussion to the relevant federal constitutional claim. *State* v. *Joly,* 219 Conn. 234, 258 n.16, 593 A.2d 96 (1991).

[6] General Statutes § 53a-91 provides in relevant part: "(1) 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. As used herein 'without consent' means, but is not limited to, (A) deception . . . . (2) 'Abduct' means to restrain a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation."

[7] We have held "that a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original.) *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

tain predicate facts. . . . A mandatory presumption violates the due process clause if it relieves the state of the burden of proving an essential element of the offense . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams,* 199 Conn. 30, 36, 505 A.2d 699 (1986). The defendant argues that the instruction in this case violated the *Sandstrom* doctrine; *Sandstrom* v. *Montana,* 442 U.S. 510, 517–24, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979); thereby rendering "irrelevant the evidence on the issue because the jury may have relied upon the presumption rather than upon that evidence." *Connecticut* v. *Johnson,* 460 U.S. 73, 85, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983).

In analyzing the defendant's claim, we assume, without deciding, that the challenged instruction constituted a *Sandstrom* violation. This assumption, however, "does not end the inquiry because such an error is harmless if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Cerilli,* 222 Conn. 556, 584, 610 A.2d 1130 (1992). "When the verdict of guilty reached in a case in which *Sandstrom* error was committed is correct beyond a reasonable doubt, reversal of the conviction does nothing to promote the interest that the rule serves." *Rose* v. *Clark,* 478 U.S. 570, 580, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986).

Upon review of the entire record, we conclude that the assumed instructional error was harmless beyond a reasonable doubt. Evidence of the victim's lack of consent to the abduction was overwhelming and undisputed. The jury heard testimony that: (1) the perpetrator was not known to the victim; (2) the victim had cried out "blood curdling" screams of "Help me," "Don't do it to me" and "Why are you doing it to me"; (3) the victim had attempted to escape from the perpetrator by kicking, fighting and screaming; (4) the per-

petrator had severely beaten the victim; and (5) officer Quinn saw the perpetrator standing over the traumatized, injured victim, thereby limiting the victim's liberty to move.[8] These facts compel the conclusion beyond a reasonable doubt that, in the absence of the assumably erroneous instruction, the jury would have concluded that the victim did not consent. Consequently, the defendant has not satisfied the fourth prong of *Golding*.

## II

The defendant next claims that his right to a fair trial was impaired because the trial court abused its discretion by complying only partially with a request by the jury to rehear testimony. We disagree.

During its deliberations, the jury requested to hear again "Doctor Alexander's testimony concerning the examination of [the victim]." The defendant contended, however, that all of Alexander's testimony should be read back to the jury. He argued that, because the adjective "physical" had not modified "examination" in the jury's request, the trial court should have had read back, not only testimony concerning the physical examination, but also the history that Alexander had taken from the victim prior to conducting the physical examination and the Sirchie sex crimes kit protocol. Specifically, the defendant stressed that the jurors should again hear Alexander's testimony that the victim had described the perpetrator of the assault as "a *short* black man" and had alleged that "he [had] raped her with *anal* penetration"; (emphasis added); because he claimed that the victim's statements to Alexander conflicted with the victim's own testimony.[9] The trial

---

[8] The defendant did not dispute this evidence at trial but merely claimed that he was not the perpetrator of the crimes.

[9] On direct examination the victim had testified that the perpetrator was "[a]bout 5′ 6, maybe 5′ 6; probably was like 155, 160, to me," and had penetrated her vaginally.

judge conferred with counsel and then told the jury that he had decided "to read what I think it is that you want. If you want a more expansive reading kindly caucus among yourselves and indicate that to me." Alexander's testimony concerning her physical findings was thereupon read to the jury and the trial court reminded the jury that other portions of the Alexander testimony were available and could be read. The jury, however, asked for no further testimony.

"No good reason occurs to us why a jury may not, at times during . . . the consideration of cases before them, be permitted . . . to have read to them parts of the official court stenographer's shorthand notes of the testimony . . . . This entire matter of causing the stenographer's notes to be so read . . . must rest, to a great extent, in the discretion of the trial judge." *State* v. *Rubaka,* 82 Conn. 59, 67–68, 72 A. 566 (1909); see Practice Book § 863; *State* v. *Bennett,* 171 Conn. 47, 58–59, 368 A.2d 184 (1976); *State* v. *Fletcher,* 10 Conn. App. 697, 703, 525 A.2d 535 (1987), aff'd, 207 Conn. 191, 540 A.2d 370 (1988). "We cannot conclude, as the defendant [argues], that the trial court was required as a matter of law to replay more of the witnesses' testimony than the jury believed it needed to rehear in order to reach a verdict." *State* v. *Rivera,* 223 Conn. 41, 48, 612 A.2d 749 (1992). We find no merit in this claim of the defendant.

## III

The defendant next claims that the trial court's refusal to grant his motion for a mistrial deprived him of a fair trial, as guaranteed by the fifth, sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution.[10] The defendant contends that a trial court reference to

---

[10] See footnote 5.

him as "the prisoner" was so prejudicial that it under-
mined the presumption of innocence to which he was
entitled. We are unpersuaded.

The defendant properly preserved this claim for
appeal. "Established principles of law govern the grant-
ing of a motion for a mistrial. The general rule in this
state is that a mistrial should be granted only when it
is apparent to the court that some occurrence during
the trial has so prejudiced a party that he can no longer
receive a fair trial. *State* v. *Ubaldi,* 190 Conn. 559, 562,
462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct.
280, 78 L. Ed. 2d 259 (1983); *State* v. *Gooch,* 186 Conn.
17, 25, 438 A.2d 867 (1982); *State* v. *Turcio,* 178 Conn.
116, 143, 422 A.2d 749 (1979), cert. denied, 444 U.S.
1013, 100 S. Ct. 661, 62 L. Ed. 2d 642 (1980). The trial
court enjoys wide discretion in deciding whether a mis-
trial is warranted; *State* v. *Nowakowski,* 188 Conn. 620,
624, 452 A.2d 938 (1982); *State* v. *Gooch,* supra; and
its decision will be reversed on appeal only if it is estab-
lished that this discretion has been abused." *State* v.
*Fleming,* 198 Conn. 255, 264, 502 A.2d 886, cert.
denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d
342 (1986).

Following the direct testimony of the victim, the trial
court, having decided that it was appropriate to recess
for the day, provided the customary cautionary instruc-
tions to the jury and then stated: "Okay, with that I
will see you back here tomorrow morning at ten o'clock.
I'm advising counsel I want everybody here including
*the prisoner,* Mr. Sheriff, here at ten so we can kick
off right then. Thank you very much." (Emphasis
added.) After the jury had exited, the defendant moved
for a mistrial. The trial court denied the motion but
immediately offered to provide a curative instruction.
The defendant asked to be allowed to ponder overnight
the potential ameliorative and exacerbating effects of
such an instruction. The next morning the trial court

offered to admonish the jurors "that I had inadvertently and mistakenly referred to [the defendant] as the prisoner and to ask them to strike that from their minds and memories. In addition thereto, I am going to give . . . an admonition that obviously the defendant is presumed to be innocent and anything that I may have said should not be used in any way against him. I'm in your hands. What would you like to do?" The defendant declined the curative instruction and argued that "by saying the word 'prisoner' you're saying he's presumed to be guilty" and that the jury would not "accept the court's previous instructions on the presumption of innocence."

"Not every reference to a defendant's pretrial incarceration is grounds for a mistrial. *State* v. *Hawthorne,* 176 Conn. 367, 371–74, 407 A.2d 1001 (1978). . . . There is nothing sacrosanct about a defendant's pretrial incarceration." *State* v. *Reddick,* 197 Conn. 115, 129, 496 A.2d 466, cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1985). The jurors had been questioned during voir dire concerning their predisposition to believe that the defendant was guilty simply because he had been arrested. They therefore knew that the defendant had been arrested and that, at some point, he must have been in police custody. The information concerning the criminal allegations against the defendant had also been read to the jury. It certainly could not have surprised the jury, therefore, to have heard the defendant referred to as "the prisoner" and, if the reference registered with the jury at all, its meaning would in all likelihood have been ambiguous. Moreover, the court provided both preliminary and final instructions concerning the presumption of innocence that the jury is presumed to have followed. Included in those instructions was an admonition that no inference was to be drawn from the defendant's arrest. See *State* v. *Rodriguez,* 210 Conn. 315, 332–33, 554 A.2d 1080 (1989).

The trial court, in its discretion, concluded that, under all the circumstances, its single remark was within the healing power of a curative instruction and did not require the drastic response of a mistrial. See *State* v. *Hill*, 201 Conn. 505, 510, 518 A.2d 388 (1986). We are unpersuaded that this isolated reference to the defendant as "the prisoner" in the overall context of carefully crafted instructions and overwhelming evidence of guilt infected the trial with unfairness and contributed to the verdict. See *Darden* v. *Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986); *State* v. *Castonguay*, 218 Conn. 486, 508, 590 A.2d 901 (1991). We conclude, therefore, that the trial court did not abuse its discretion by denying the defendant's motion for a mistrial and that its denial did not deprive the defendant of a fair trial.

## IV

The defendant next claims that he was deprived of his constitutional rights to a fair trial by an impartial jury and to due process of law, as guaranteed by the fifth, sixth and fourteenth amendments to the United States constitution, and article first, §§ 8 and 19, of the Connecticut constitution, as amended by article fourth of the amendments to the Connecticut constitution.[11] See General Statutes §§ 54-82b, 54-82f, 54-82g and 54-82h and Practice Book §§ 843 and 847 through 849. The defendant's claim rests on the allegedly prejudicial effects of the trial court's rulings on his challenges for cause directed to certain venirepersons and its ruling denying his request for an additional peremptory challenge.

The defendant was accorded his right to exercise eight peremptory challenges pursuant to General Statutes §§ 54-82g and 54-82h (a). After he had exhausted

---

[11] See footnote 5.

all eight of his peremptory challenges but before the fifth and sixth members of the six person jury had been selected, the defendant requested an additional peremptory challenge. *State* v. *Esposito,* 223 Conn. 299, 303, 613 A.2d 242 (1992); but see *State* v. *Vitale,* 190 Conn. 219, 224–25, 460 A.2d 961 (1983). The trial court refused his request. The defendant subsequently challenged the sixth juror for cause and, after the trial court had overruled his challenge, stated that he would have exercised the requested additional peremptory challenge if the court had granted it.[12]

"The constitutional standard of fairness requires that a defendant have 'a panel of impartial, "indifferent" jurors.' *Irvin* v. *Dowd,* [366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961).]" *Murphy* v. *Florida,* 421 U.S. 794, 799, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975); see *State* v. *Esposito,* supra, 308–309. We agree with the defendant that the enactment of article first, § 19, of the Connecticut constitution, as amended, "reflects the abiding belief of our citizenry that an impartial and fairly chosen jury is the cornerstone of our criminal justice system." *State* v. *Hancich,* 200 Conn. 615, 625, 513 A.2d 638 (1986). We have held that if a potential juror has such a fixed and settled opinion in a case that he cannot judge impartially the guilt of the defendant, he should not be selected to sit on the panel. *State* v. *Ziel,* 197 Conn. 60, 66, 495 A.2d 1050 (1985).

"The trial court is vested with wide discretion in determining the competency of jurors to serve, and that judgment will not be disturbed absent a showing of an abuse of discretion." *State* v. *Cubano,* 203 Conn. 81, 88–89, 523 A.2d 495 (1987); *State* v. *Anthony,* 172 Conn. 172, 175, 374 A.2d 156 (1976). On appeal, the

---

[12] The defendant also admitted that he could not have successfully challenged for cause the venireperson selected as the fifth juror, but stated that he would have exercised a peremptory challenge if he had been able to do so.

defendant bears the burden of showing that the rulings of the trial court resulted in a jury that could not judge his guilt impartially. *State* v. *Marra,* 195 Conn. 421, 432, 489 A.2d 350 (1985).

The defendant claims that the trial court improperly denied his motions to excuse for cause five venirepersons, thereby forcing him unnecessarily to use peremptory challenges.[13] By the time four jurors had been accepted, the defendant had exhausted his statutory allotment of eight peremptory challenges. He subsequently challenged unsuccessfully the sixth juror for cause and stated that he would have excused the fifth and sixth jurors if he had not exhausted his allotment of peremptory challenges, or if he had been granted the requested additional peremptory challenge.[14] The defendant did not challenge the two alternates for cause and does not claim, nor does the record support a claim, that he would have peremptorily challenged either of the alternates had his statutory allotment of challenges not been exhausted. Thus, according to the defendant, if he had not been forced to exercise his peremptory challenges to remove jurors whom the court had improperly refused to remove for cause, he would have used his peremptory challenges to excuse the venirepersons who subsequently became the fifth and sixth members of the jury.[15]

We focus on those jurors who actually decided the defendant's fate rather than on those venirepersons who were excused for cause or peremptorily. *Ross* v.

---

[13] The defendant peremptorily removed four of five venirepersons whom he had unsuccessfully challenged for cause and stated that he would have similarly excused the fifth had he been able to do so.

[14] See footnote 12.

[15] The transcript reveals that the panel comprised thirty-eight venirepersons. Six were selected as jurors and two as alternates. The trial court, on its own motion, excused fifteen for cause. The defendant exercised all eight of his peremptory challenges and the state exercised seven.

*Oklahoma,* 487 U.S. 81, 85, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988); *State* v. *Pelletier,* 209 Conn. 564, 572–73, 552 A.2d 805 (1989). In the present case, no juror who participated in reaching the verdict had been challenged for cause. During the trial, the sixth juror, whom the defendant had challenged for cause and who he claims he would have challenged peremptorily, was arrested, and he was therefore replaced by an alternate, designated by lot, whom the defendant had not deemed to be unacceptable. General Statutes § 54-82h (c). The defendant dismisses the importance of the final composition of the jury because it was not foreseeable and urges us to decide his claim instead on the basis of the jury as impaneled initially rather than the jury that ultimately returned the verdict. In any case, however, unless the trial court improperly overruled the defendant's challenges for cause, the defendant cannot prevail on his claim that the trial court improperly limited his peremptory challenges to the number prescribed by §§ 54-82g and 54-82h (a), pursuant to article first, § 19, of the state constitution, as amended.

We have held that the state constitutional right to a trial by jury is abridged if the "trial court . . . force[s] an accused to use peremptory challenges on persons who should have been excused for cause, provided the party subsequently exhausts all of his or her peremptory challenges and an additional challenge is sought and denied." (Internal quotation marks omitted.) *State* v. *Esposito,* supra, 313.[16] Accordingly, we

---

[16] In this regard, after the first four venirepersons had been excused for cause on the trial court's own motion, the defendant requested that the record reflect the race of those excused. The following colloquy ensued:

"[Defense Counsel]: I'm not questioning [the excusals for cause]. They were legitimate.

"The Court: The first woman indicated that she could not sit in judgment on anybody [because of her religious beliefs], and Mr. Morrison gave

review carefully the bases upon which the defendant challenged five prospective jurors for cause.

## A

The defendant challenged venireperson Karen Goddard for cause on the basis of her answers to questions concerning interracial marriage. During voir dire, the following colloquy occurred:

"[Defense Counsel:] Do you feel that blacks and whites should not intermarry? Should be segregated as far as marriage?

"[Karen Goddard:] Yes.

"Q. Why is that?

"A. I don't know. I just wouldn't want my daughter to marry one and I wouldn't want, you know, if I were a black mother I wouldn't want a black one to marry a white girl. This is how I feel about that. And that doesn't mean—maybe that is called prejudice."

After Goddard had left the courtroom, the defendant moved that she be excused for cause and the court overruled the request.[17] Similar exchanges occurred

almost the exact same answers [that an arrestee can be presumed to have done something illegal] as [the venireperson], who happened to be white, who was before him.

"[Defense Counsel]: That's not what I'm questioning, just down the line . . . when the issue really becomes contested we always say wasn't so and so black . . . .

"The Court: Both of those people were black.

"[Defense Counsel]: And we can take judicial notice that my client is black.

"The Court: Yes.

"[Defense Counsel]: And again, it wasn't to question Your Honor's rulings, but just to make a cleaner record.

"The Court: *What I'm trying to do is make darn sure that both the State and you have a fair jury and I'm not going to make you use up all of your peremptory challenges on people that clearly should be excluded.*" (Emphasis added.)

[17] The defendant argued: "[M]y grounds are my questions concerning segregation. The bottom line is that she believes that, or she implies—well,

with and concerning juror Ronald Alcorn. The defendant argues that Alcorn similarly manifested bias and should have been excused for cause. Because the defendant's arguments concerning Alcorn involve no substantial factual or legal distinctions that are not present in the case of Goddard, our analysis of the defendant's arguments concerning Goddard applies, as well, to his claim concerning Alcorn.

"To succeed on a claim of bias the defendant must raise his contention of bias from the realm of speculation to the realm of fact." (Internal quotation marks omitted.) *State* v. *Marra,* supra, 433; *State* v. *Almeda,* 189 Conn. 303, 313, 455 A.2d 1326 (1983); *State* v. *Bowen,* 167 Conn. 526, 532, 356 A.2d 162 (1975). "Although we believe that the question on interracial marriage was relevant in that it might have revealed subconscious racism on the part of a prospec-

she believes that the races should be segregated by marriage. I am not talking about neighborhoods and things of that nature. But she believes that . . . blacks should not marry whites. More powerfully within her family. But she also is talking . . . in general."

The following colloquy ensued:

"The Court: I will not remove her for cause. It was clear to me . . . [that] she indicated [that] she lived in a predominately black neighborhood, she has black friends, she has been to black homes, she has had blacks to her home, she would have no problems with her children being friends with blacks, they have had black friends, and I don't see a real prejudice.

"[Defense Counsel]: I had not finished my remarks. She was not able to articulate, and I can foresee . . . asking these questions of people and their responding with a certain articulation which would neutralize the situation or which would not evoke me to stand up and make this motion that she be excused for cause, but she was not able to articulate any reason of her own why blacks and whites should not intermarry. If she was able to articulate a reason then perhaps I wouldn't be making this. I think your Honor's comments about her neighborhood, she lived in an interracial neighborhood once. I think she responded or she told the Court that that was primarily because it was close to her work . . . . It appears to me that it was not a decision by choice . . . but a decision by necessity . . . . She mentions that she . . . thought it best not to associate [with blacks]. . . .

"The Court: With the people on her floor so that she did not lose her position of authority. . . ."

tive juror, we do not look at that question in isolation to determine whether the defendant's claim has merit. Instead, we assess the claim in the context of the entire voir dire to determine whether the defendant was afforded a sufficient opportunity to expose racist attitudes among the prospective jurors." *State* v. *Smith,* 222 Conn. 1, 7, 608 A.2d 63, cert. denied, U.S. , 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992). Although the parties have reflected on alternative meanings and inferences that can be drawn from the venirepersons' terse responses to the defendant's lengthy, sometimes convoluted and often hostile questions[18] concerning a complex and sensitive contemporary social issue,[19] we conclude that the trial court did not abuse its discretion in determining that the venirepersons' answers reflected a viewpoint regarding interracial marriage

[18] After the defendant had peremptorily excused Ronald Alcorn because of his answers to questions concerning interracial marriage, the following colloquy occurred:

"The Court: Obviously I want a jury that is not biased toward your client in any way and the only problem that I had, and perhaps we can correct that, we are all gentle people and I thought you were really going after the jurors kind of hard and almost baiting them, especially . . . Alcorn. Obviously questions have to be probative . . . . But I would appreciate it if you could phrase them in a way that they are not quite as assaultive on the witnesses. I know you are in a difficult position.

"[Defense Counsel]: I assure the Court I am not intentionally doing that . . . . I don't have the video tape of my style but I will certainly take what Your Honor has said under advisement."

[19] We recognize that the issue of interracial marriage is an issue regarding which different people may hold different views based upon different motivations. It is no doubt true that a negative attitude regarding the issue may, in a particular individual, be the result of a racial animus that would disqualify that person as a juror. In other individuals, as in this case, it may not be the result of such animus, because that view may stem solely from religious, cultural, philosophical or other personally held conceptions that do not implicate racial prejudice. That is why it is necessary for both the trial court, and for this court upon review, to gauge the response, not in isolation, but in the context of the venireperson's responses to other race-related questions; *State* v. *Smith,* 222 Conn. 1, 7, 608 A.2d 63, cert. denied, U.S. , 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992); as both the trial court did and we do in this case.

that did not affect their ability to sit as impartial jurors in this case. The trial court was able to observe the conduct of all the participants. Demeanor plays an important part in the determination of a juror's impartiality. The assessment of a potential juror's impartiality under such circumstances "is particularly within the province of the trial judge and the trial judge has broad discretion in deciding whether to excuse a juror for cause." *Johnson* v. *New Britain General Hospital,* 203 Conn. 570, 584, 525 A.2d 1319 (1987). The record lacks adequate factual support for the defendant's argument that the trial court abused its discretion by overruling his requests to remove Goddard and Alcorn for cause.[20] Accordingly, we conclude that the record before us does not support the defendant's contention that the court abused its discretion by refusing to excuse Goddard and Alcorn for cause, and that, as a matter of law, Goddard and Alcorn were not competent to judge this case fairly and impartially.

In this case, Goddard testified not only about her negative feelings concerning racial intermarriage[21] but

[20] The trial court excused other venirepersons because of concerns of racial bias. For example, the following colloquy occurred the day before Goddard and Alcorn were excused.

"The Juror: Well, I feel I'm a little bit prejudiced, but I would do my best to make an honest—

"The Court: Now, you've just raised a big red flag. How do you mean prejudiced? . . .

"The Juror: What do I mean?

"The Court: And I'm not trying to embarrass you . . . .

"The Juror: I'm trying to put it in a way to be polite and everything, I'm not that, with black people.

"The Court: You don't think you could give the defendant a fair shake is what you're saying?

"The Juror: Yes.

"The Court: Better to say something than to hide it deep in your heart and he not get a fair shake. I'm going to excuse you. . . ."

[21] Goddard testified, in response to a suggestion by the defendant, that she did not believe that black persons are inferior to white persons. The

also about her discomfort when she lived in a part of New Haven that she described as "a black neighborhood."[22] She also testified, however, that she and her son had had amicable social relationships with black friends.[23] Alcorn testified to his negative feelings about intermarriage.[24] Although he had had little occasion to have social relationships with black people, his testimony also indicated his open-mindedness,[25] and the defendant's sole basis for claiming that he be excused for cause was his responses to the questions regarding intermarriage.

This case serves as an occasion to remind the trial courts of the difficulties of proving racial prejudice. A

defendant then asked her: "Then why shouldn't they marry whites?" She answered that she did not know, that she was brought up that way in New Hampshire, where there were not many black persons.

[22] In response to the defendant's question whether Goddard had ever had a negative experience with black persons that "[stuck] in [her] mind," she responded that, after graduating from nursing school, she lived in "a black neighborhood" that was within walking distance of her job at a hospital. She explained that the persons in the neighborhood "made it very difficult for me to move into that area," and that "I was very uncomfortable and I was threatened and things like that."

[23] Goddard testified that she had black friends, that she had worked with black persons, that she had visited socially with black persons, both in her home and in their homes, that her son had black friends, both in their home and at school, and that she did not feel that black persons are inferior to white persons.

[24] Alcorn testified that he "never believed in intermarriage." When asked why, he responded: "I don't know. It is probably more like the way I was brought up, I guess, and not being in black neighborhoods." He testified further that although "the subject was never brought up," he "assumed it was the races stayed for marriage-wise." He also testified, however, that if his son or daughter wanted to marry a black person, he would be able to accept it.

[25] The trial court, in denying the defendant's motion that Alcorn be excused for cause, found that "he has worked with blacks, apparently grew up with blacks, went to school with them, he thought [that] interracial marriage is a question to be left to the individual, but he wouldn't prefer an interracial marriage for his own children. I don't see where that shows any deep bias or prejudice against your client in any way, shape or form . . . ."

juror is not likely to admit being a prejudiced person, against African-Americans or Asian-Americans or Hispanics, as the case may be, and indeed might not recognize the extent to which unconscious racial stereotypes might affect his or her evaluation of a defendant of a different race, or of the witnesses produced on that defendant's behalf.

There are some questions regarding racial attitudes the responses to which may raise red flags that should heighten the attention of the court. Although, as we have noted, a negative attitude toward racial intermarriage may well stem from racially benign motivations, we also have recognized the possibility that it may stem from racially invidious motivations. Because of the sensitivity of the issue and the importance of probing investigation into the possibility of bias, if a venireperson's response reveals an antagonism toward racial intermarriage the trial court should, as it did in this case, extend substantial latitude to explorative inquiries by counsel and, if necessary, should itself question the venireperson, as the trial court also did in this case. If that exploration leaves the trial court in doubt[26] about the juror's ability to evaluate the defendant's case on the evidence, without bias or predilection, the court should exercise its discretion to excuse the juror. Our state and national commitment to equal justice demands no less.

---

[26] We do not underestimate the delicacy of the factual judgment that the trial court must make in such a case. If the trial court is too eager to excuse a venireperson solely because of his or her negative attitude toward racial intermarriage, that could unjustifiably disenfranchise many qualified citizens from jury service. We believe, however, that the proper balance for the wise exercise of the trial court's discretion will be reached by: (1) affording the degree of latitude of exploration that we have suggested; and (2) suggesting further that, after the exploration has been completed, if the trial court has a doubt about the venireperson's impartiality that doubt should result in an excuse for cause.

## B

The defendant sought to remove Janet Doerner for cause because she expressed her reluctance to serve as a juror in a rape case and because she had been the victim of a burglary eight years before this trial. The defendant's claim focuses on the following colloquy:

"[Defense Counsel:] Would you like to be a juror in this case?

"[Janet Doerner:] Very difficult case.

"Q. It is a rape charge.

"A. Yes.

"The Court: Is that a question?

"[Defense Counsel:] Yes.

"The Court: That was a statement.

"Q. Considering it is a rape charge would you like to be a juror on this case?

"A. To be perfectly honest, no. I have very strong views.

"Q. Is that because of the past unfortunate incident eight years ago?

"A. No. I think that is because I have a daughter and—

"The Court: Well, I think it is fair to say nobody is in favor of rape in our society and these are mere allegations against the defendant.

"Ms. Doerner: Right.

"The Court: If you were picked to sit you would be fair and impartial towards him?

"Ms. Doerner: Yes, I would be.

\* \* \*

"[Defense Counsel:] Due to the fact that it is a rape charge and you would not like to sit on it as a juror

because it is a rape charge, do you feel in your heart, in your heart that you could be fair and impartial to a person charged with rape?

"A. Yes, I think I could.

"Q. In your heart.

"A. Yes."

The defendant requested that Doerner be excused for cause because she had demonstrated that she could not be fair and impartial as a juror.[27] The trial court overruled the request because Doerner had assured the court that she could be a fair and impartial juror if she were to be selected.[28] The defendant exercised his sev-

---

[27] The defendant also excepted to the trial court's refusal to take judicial notice that Doerner was almost in tears during the voir dire. The trial court stated: "I did not see any tears in her eyes. I was looking at her all the time. You were bearing down on her, almost overbearing down on her. You are trying to light up something that wasn't there. There was an incident some eight years ago that she has not thought about in the past year until you brought it out. I will not take judicial notice of something I didn't see . . . ."

[28] The trial court excused Jeanne Cinotti for cause after the following colloquy had occurred:

"[Defense Counsel:] Anything about the nature of these charges that might cause you some concern?

"[Jeanne Cinotti:] Certainly does.

"Q. Would you explain that to us?

"A. Rape alone is enough that it upsets me."

The trial court also excused Elinor Karn after the following exchange:

"[Assistant State's Attorney:] Have you ever been the victim of a crime yourself:

"[Ms. Karn:] I was mugged a few years ago.

"Q. That counts. Where did it occur?

"A. Front of where I live.

* * *

"Q. What happened . . . ?

"A. He had a knife to my ribs and took my money.

* * *

"The Court: Was the alleged perpetrator . . . black or white?

"Ms. Karn: Black.

enth peremptory challenge. We conclude that the record does not support the defendant's claim that the trial court abused its discretion by refusing to remove Doerner for cause.

## C

The defendant claimed that venireperson Richard Mucha should have been removed for cause because of his comments concerning the standard of proof beyond a reasonable doubt and the alleged financial hardship that jury service would entail.

"[Defense Counsel]: Now the burden that the State has is that it must prove its case not just probably, but beyond a reasonable doubt. How do you feel about that rule of law placing such a burden on the prosecution?

"A. No, I don't know what to say on that.

"Q. Would you have any difficulty in placing such a burden on the prosecution and making them prove its case beyond a reasonable doubt?

"A. Depends on the way they stated it.

"Q. But if his Honor basically tells you quite simply that that is the State's burden, they must prove its case beyond a reasonable doubt, and if at the end of hearing all the evidence you were of the opinion that Mr. Tucker probably did it, but according to the Judge's instructions that you use you felt according to those instructions that the State had not proven the case beyond a reasonable doubt, would you have any difficulty in accepting that instruction and finding him not guilty?

---

"The Court: The defendant . . . happens to be black. Would you hold it against him in any way?
"Ms. Karn: No.
"The Court: Are you sure?
"Ms. Karn: Absolutely."

"A. Yes, I think so.

"Q. You would?

"A. Yes.

"Q. How much difficulty would you have?

"A. I don't know. Again I have never been through this.

"Q. Fine.

"[Assistant State's Attorney]: I have some question in mind whether the witness understood that last question.

"The Court: Yes. Briefly the law is crystal clear that the State has to prove, and there are three charges here, and there are certain elements that go into [each of] the crimes . . . and the State has to prove, if he can prove, every one of those crimes and all the elements of them beyond a reasonable doubt. Now that is not beyond all doubt, but beyond a reasonable doubt, and I will define that for you later. If they can't prove that you have to find him not guilty. Would you be willing to abide by that instruction?

"Mr. Mucha: Yes, okay, I see.

"The Court: Because that is the law.

"Mr. Mucha: Yes.

"The Court: It is crystal clear, you have to be willing to do it. If you can't do it please let us know."[29]

On the matter of the defendant's allegation of the financial hardship that would be imposed on Mucha because of jury service, the trial court stated that the defendant's questioning concerning financial hardship

---

[29] The trial court subsequently provided an extended definition of the standard of reasonable doubt to which Mucha assured the court that he would be bound.

was based upon the assumption that the trial would take two weeks and that although "[i]t is . . . unfortunate . . . that people do sustain some financial burdens by being called upon as jurors, however . . . that has never been a basis for exclusion."[30] From our review of the transcript of the entire voir dire examination of Mucha, we conclude that the trial court did not abuse its discretion by overruling the defendant's request to excuse Mucha for cause.

### D

Venireperson Sally Savvidou recounted a domestic incident, in which a male had shoved her, that had occurred approximately eighteen months previously. She stated that the incident did not have any sexual overtones and that it would not affect her judgment in this case. The trial court overruled the defendant's request to excuse Savvidou for cause and stated that the court had allowed the defendant to "go much farther afield than I normally would" to examine the shoving incident. The trial court concluded that Savvidou would be "an excellent juror. . . . I find absolutely no cause here." Our review of the transcript again precludes any conclusion that the trial court abused its discretion by overruling the defendant's request to excuse Savvidou for cause.

After hearing the arguments of counsel and deliberating on each challenge for cause, the trial court concluded that the challenged venirepersons could afford

---

[30] The defendant argued that Mucha indicated that, because of anxiety concerning his employment (he was a commission salesman), he could not serve as a fair and impartial juror. The trial court noted, however, that Mucha's response on this topic was in answer to leading questions and was not credible. The court stated: "[A] light went off in his head. He said, 'I have a shot at getting out of this, something I don't want to do.' The way the question was phrased it was somewhat leading. You were Johnny Unitas and he was Raymond Berry. He caught the pass. He did very well, but he is not getting off."

the defendant a fair and impartial trial. Although a " 'juror's assurances that he is equal to this task cannot be dispositive of the accused's rights . . .' *Murphy* v. *Florida,* [421 U.S. 794, 800, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975)]"; *State* v. *Marra,* supra, 433; the defendant has failed to demonstrate convincingly why these five venirepersons could not have been fair and impartial jurors. We conclude, therefore, that the trial court acted within its discretion by refusing to excuse for cause the five venirepersons who were subsequently peremptorily challenged by the defendant. We also conclude that, under these circumstances, the trial court did not abuse its discretion by refusing to grant the defendant's request for an additional peremptory challenge.

V

The defendant next claims that he is entitled to a new trial because the trial court, in instructing on the elements of sexual assault in the first degree, did not expressly inform the jury that it had to be unanimous in finding whether the defendant either used force *or* threatened the use of force against the victim to accomplish intercourse.[31] General Statutes § 53a-70 (a) (1).[32] The defendant invokes the guarantees of the sixth and fourteenth amendments to the United States constitution and article first, §§ 8 and 19, of the Connecticut constitution, as amended by article fourth of the amendments to the constitution.[33] *State* v. *Famiglietti,* 219 Conn. 605, 619, 595 A.2d 306 (1991); *State* v. *John,* 210 Conn. 652, 690, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989); see Practice Book § 867.

---

[31] In the long form information on which the defendant was prosecuted, the first count alleged that the defendant had violated General Statutes § 53a-70 (a) by compelling another person to engage in sexual intercourse by the use of force *or* the threat of use of force.

[32] See footnote 1.

[33] See footnote 5.

The state contends that the defendant's claim, which concededly was unpreserved at trial, fails on either the second or third prong of *State* v. *Golding,* supra. We agree with the defendant that "[a] claim bearing on the defendant's right to a unanimous verdict implicates a fundamental constitutional right to a fair trial and is thus reviewable despite the defendant's failure to request a specific unanimity charge or to take proper exceptions." *State* v. *Famiglietti,* supra, 619, and cases cited therein. We also agree with the defendant that the record is adequate to review his claim. *State* v. *Golding,* supra, 239.

After a trial, the defendant was found guilty by a jury of having committed sexual assault in the first degree in violation of § 53a-70 (a) (1). A person is guilty of having committed sexual assault in the first degree pursuant to § 53a-70 (a) (1) if he "compels another person to engage in sexual intercourse by the use of force . . . *or* by the threat of use of force . . . ." (Emphasis added.) In its charge to the jury, the trial court defined both the use of force and the threat of the use of force. The court then instructed the jury in the disjunctive, stating that "it can be either physical force *or* threat of force, physical force. You don't have to be unanimous on which one under our law." (Emphasis added.) The defendant contends that the trial court thereby impermissibly sanctioned a nonunanimous verdict. We disagree.

"Although a . . . defendant's right to a unanimous verdict is clear, the scope of that right, unfortunately, is not." *United States* v. *Gipson,* 553 F.2d 453, 456 (5th Cir. 1977).[34] Recently, however, in *State* v. *Famiglietti,*

---

[34] In *United States* v. *Gipson,* 553 F.2d 453, 458 (5th Cir. 1977), the court held that the unanimity requirement requires the jury to agree on the factual basis for an offense if alternative acts charged are conceptually distinct and the state has presented supporting evidence on each alternative

supra, we explained that even if the trial court's instructions can be read to have expressly sanctioned a nonunanimous verdict, a defendant is entitled to a new trial only if: (1) the alternative acts with which the defendant has been charged are conceptually distinct; and (2) the state has presented evidence to support each of the alternative acts with which the defendant has been charged. Id., 619–20, and cases cited therein. In the present case, the trial court expressly instructed the jury that it was not required to reach unanimity as to how exactly the defendant had violated the statute; and the state had presented evidence of both the defendant's use of force and the defendant's threats to use force against the victim. We conclude, however, that there is no conceptual distinction between the alternative acts with which the defendant was charged.

"[T]he language of § 53a-70 divides the statute, not into two crimes, but into two methods of committing the same crime . . . ." *State* v. *Secore,* 194 Conn. 692, 698, 485 A.2d 1280 (1984); see *State* v. *Tanzella,* 226 Conn. 601, 611, 628 A.2d 973 (1993). The use of force and the threat of the use of force are quite simply two alternative methods of compulsion used by an actor to commit the one crime of sexual assault in the first degree. See *Rice* v. *State,* 311 Md. 116, 136, 532 A.2d 1357 (1987). To invalidate a jury instruction that mirrors the disjunctive language of the statute defies both logic and experience. See *State* v. *Kitchen,* 110 Wash. 2d 403, 410, 756 P.2d 105 (1988). " 'Where a trial court charges a jury that the commission of any one of several alternative acts would subject a defendant to criminal liability, a unanimity charge on a specific act is required only if two conditions are met: (1) the alternative acts are *conceptually distinct* from each other; *and* (2) the

act. *State* v. *Flanders,* 214 Conn. 493, 504, 572 A.2d 983, cert. denied, 498 U.S. 901, 111 S. Ct. 260, 112 L. Ed. 2d 217 (1990); *State* v. *Anderson,* 211 Conn. 18, 34–35, 557 A.2d 917 (1989).

state has presented *supporting evidence* on each alternative act. *State* v. *Benite,* [6 Conn. App. 667, 674–75, 507 A.2d 478 (1986)].' (Emphasis in original.) [*State* v. *Flynn,* 14 Conn. App. 10, 38, 539 A.2d 1005, cert. denied, 488 U.S. 891, 109 S. Ct. 226, 102 L. Ed. 2d 217 (1988)].

"In essence, the unanimity requirement as enunciated in *Gipson* and its progeny requires the jury to agree on the factual basis of the offense. The rationale underlying the requirement is that a jury cannot be deemed to be unanimous if it applies inconsistent factual conclusions to alternative theories of criminal liability. . . .

"As *Gipson* itself recognizes, however, specific unanimity instructions are not required if the alternative bases of liability are not 'conceptually distinct.' *United States* v. *Gipson,* supra, 458. 'The jury should not be obliged to decide between two statutorily prohibited ways of committing the crime if the two ways are practically indistinguishable.' *Manson* v. *State,* 101 Wis. 2d 413, 430, 304 N.W.2d 729 (1981); *State* v. *Giwosky,* 109 Wis. 2d 446, 455, 326 N.W.2d 232 (1982). 'The determination of whether actions are conceptually distinct must be made with reference to the purpose behind the proposed charge: to ensure that the jurors are in unanimous agreement as to what conduct the defendant committed.' *State* v. *Benite,* supra, 675." *State* v. *Bailey,* 209 Conn. 322, 334–35, 551 A.2d 1206 (1988).

*Gipson's* requirement that a jury verdict be unanimous applies only if the acts on which unanimity is required fall into " 'distinct conceptual groupings.' " *United States* v. *Peterson,* 768 F.2d 64, 66–67 (2d Cir. 1985).[35] "The *Gipson* logic requires the jury to agree

[35] The defendants in *United States* v. *Gipson,* 553 F.2d 453 (5th Cir. 1977), were charged with violating 18 U.S.C. § 2313, which subjects to criminal liability one who knowingly "receives, conceals, stores, barters, sells or

on the factual theory or 'concept' underlying criminal liability but does not require it to split hairs over nomenclature." *Holland* v. *State,* 91 Wis. 2d 134, 139, 280 N.W.2d 288 (1979). In the present case, the two methods of compulsion are not conceptually distinct. *State* v. *Daniels,* 18 Conn. App. 134, 148, 556 A.2d 1040 (1989); *Manson* v. *State,* supra. "[T]he element of compulsion, the utter subjugation of the victim's free will, is no different in character if it results from the raised fist or the first blow. . . . [W]e are convinced that the phrase 'use or threat of force or violence' is a sound and reasonable attempt to capture the essence of the proscribed conduct [sexual assault], and we conclude that to require jury unanimity on 'use of force' as opposed to 'threat of force' . . . would be inconsistent with the aim of the legislature in defining the offense and, more important, would reduce the efficacy of the statute itself." *State* v. *Baldwin,* 101 Wis. 2d 441, 450–52, 304 N.W.2d 742 (1981); see *State* v. *West,* 3 Conn. App. 650, 656, 491 A.2d 428, cert. denied, 196 Conn. 810, 494 A.2d 906 (1985); see also *State* v. *Velez,* 17 Conn. App. 186, 199, 551 A.2d 421 (1988), cert. denied, 210 Conn. 810, 556 A.2d 610, cert. denied, 491 U.S. 906, 109 S. Ct. 3190, 105 L. Ed. 2d 368 (1989).

disposes" of any stolen vehicle involved in interstate commerce. "These six acts fall into two distinct conceptual groupings; the first consisting of receiving, concealing and storing, and the second comprised of bartering, selling, and disposing. Within each grouping, the acts are sufficiently analogous to permit a jury finding of the actus reus element of the offense to be deemed 'unanimous' despite differences among the jurors as to which of the intragroup acts the defendant committed. This is so for two reasons. First, the acts within each grouping are not conceptually distinct. The single act of keeping a vehicle in a certain place may constitute both concealing and storing; or the single act of marketing a vehicle may simultaneously constitute bartering, selling, and disposing. Second, distinguishing among the acts within each grouping presents characterization problems. One juror may view a defendant's actions in housing a stolen vehicle as receiving, while another juror may conclude that the same actions constitute concealing or storing." Id., 458.

In the present case, the defendant simply used two methods of compulsion in the commission of the same offense. *State* v. *Scognamiglio,* 202 Conn. 18, 22, 519 A.2d 607 (1987); *State* v. *Franko,* 199 Conn. 481, 490, 508 A.2d 22 (1986). The victim testified that the defendant picked her up, carried her behind a store and threw her down onto the ground. When the victim tried to resist the defendant, he punched her in the face repeatedly and choked her and, when she screamed, he threatened to kill her if she did not stop. She complied with his demands. The essence of § 53a-70 (a) (1) is to proscribe and punish compelled sexual intercourse. To agree with the defendant's argument would be inconsistent with that purpose.[36] Because the record contains compelling evidence that the defendant both used force and also threatened to use force, no constitutional purpose would be served by requiring that a defendant be set free if reasonable jurors unanimously had agreed that a raised fist following a blow constituted either the threat of additional force or the use of additional force to coerce intercourse, but had not unanimously agreed that the defendant compelled sexual intercourse through the use of force alone, the threat of the use of force alone, or by both the threat of the use of force *and* the use of force.[37] Just as the several

---

[36] The defendant also argues that "use" of force is distinct from a "threat" of force because the former exists in the present and the latter involves an act that may occur in the future. The defendant has discerned an etymological difference but not a distinction. The defendant's standard would involve juries in characterization problems that would set defendants free not because the jury could not unanimously agree that a defendant had committed the act prohibited by the penal statute but because the jury was required to decide between two statutorily prohibited ways of committing the same crime that are practically indistinguishable. See generally annot., Requirement of Jury Unanimity as to Mode of Committing Crime under Statute Setting Forth the Various Modes by Which Offense May Be Committed, 75 A.L.R.4th 91 (1990); comment, "Right to Jury Unanimity on Material Fact Issues: *United States* v. *Gipson,* " 91 Harv. L. Rev. 499 (1977).

[37] "While . . . different conduct may constitute the use of force and the threat of imminent use of force and that use of force and the threat

ways in which compelled sexual intercourse may be performed within the meaning of General Statutes § 53a-65 (2) constitute one offense; *State* v. *Milardo,* 224 Conn. 397, 413, 618 A.2d 1347 (1993); *State* v. *Anderson,* 211 Conn. 18, 35, 557 A.2d 917 (1989); the alternative behaviors evidencing the coercion by which this defendant compelled sexual intercourse comprise only one offense under § 53a-70 (a) (1). "[W]e do not believe the defendant's right to a unanimous jury verdict extends to jury unanimity with respect to the alternative method of satisfying the force component of [first degree sexual assault] contained in [§ 53a-70 (a) (1)]." *State* v. *Baldwin,* supra, 448.

We conclude, therefore, that the disjunctive instruction given was not constitutionally flawed because the single count of sexual assault in the first degree charged comprised but one continuing criminal episode, there was ample evidence of both statutorily proscribed methods of compulsion and they are not conceptually distinct. Accordingly, in the absence of a constitutional violation, the defendant cannot prevail on his claim under *Golding*.

---

of imminent use of force can have a disparate impact on the [victim], we conclude that neither the nature of the conduct as force or threat (as long as one or the other is present) nor the disparate impact of force or threat on the [victim] is material to the question of whether or not a [sexual assault] has been committed. The concept embodied in the terms use of force and the threat of imminent use of force is coercion or compulsion by an actual or threatened act against the person of the [victim] to overcome his or her resistance or to gain his or her acquiescence. Because use of force and the threat of imminent use of force are means to the same end and are accomplished by a similar mechanism—behavior which evidences force—we conclude that those proscribed acts are similar." *Manson* v. *State,* 101 Wis. 2d 413, 427, 304 N.W.2d 729 (1981). "Use of force and threat of imminent use of force comprise one conceptual grouping under the 'conceptual grouping' doctrine set forth in [*United States* v. *Gipson,* 553 F.2d 433 (5th Cir. 1977)]." Id., 430.

## VI

The defendant claims finally that he is entitled to a new trial because the trial court violated his federal and state constitutional right to a fair trial by improperly instructing the jury concerning the standard of proof beyond a reasonable doubt. The trial court instructed the jury that "a reasonable doubt is a doubt for which you could in your own mind consciously find a reason," and that the principles of proof beyond a reasonable doubt and the presumption of innocence "are made to protect the innocent, not the guilty." The defendant did not object to the charge as given. He now claims, however, that these instructions "incorrectly stated the law by diluting the State's burden of proof . . . and undermining the presumption of innocence." *Floyd* v. *Meachum,* 907 F.2d 347, 354 (2d Cir. 1990). We disagree.

We analyze this unpreserved claim in accordance with the framework set forth in *State* v. *Golding,* supra, and conclude that the defendant has not established a clear violation of his constitutional right to a fair trial. " 'The record reveals that the trial court's jury instructions concerning the presumption of innocence and reasonable doubt are the same or similar to jury instructions that previously have been approved by this court. See, e.g., *State* v. *Brown,* 199 Conn. 14, 28, 505 A.2d 690 (1986); *State* v. *Leecan,* 198 Conn. 517, 538–39, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986); *State* v. *Findlay,* 198 Conn. 328, 345–46, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 721 (1986); *State* v. *Palmer,* 196 Conn. 157, 168–69, 491 A.2d 1075 (1985); *State* v. *Just,* 185 Conn. 339, 353, 441 A.2d 98 (1981). Those instructions, and any deviation from the previously approved language of those instructions did not, when viewed in the context of the entire charge, dilute

the defendant's presumption of innocence or lessen the state's burden of proof as claimed by the defendant. It is clear after reading the court's charge in its entirety that the jury was adequately informed that the defendant was presumed innocent until the state proved otherwise and that it was the state's burden to prove him guilty beyond a reasonable doubt. *State* v. *Derrico,* 181 Conn. 151, 170–71, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980); *State* v. *Guthridge,* 164 Conn. 145, 154, 318 A.2d 87 (1972), cert. denied, 410 U.S. 988, 93 S. Ct. 1519, 36 L. Ed. 2d 186 (1973); *State* v. *Cari,* 163 Conn. 174, 181, 303 A.2d 7 (1972).' *State* v. *Thomas,* 214 Conn. 118, 119–20, 570 A.2d 1123 (1990)." *State* v. *Stanley,* 223 Conn. 674, 695–96, 613 A.2d 788 (1992); see also *State* v. *Campbell,* 225 Conn. 650, 661–62, 626 A.2d 287 (1993); *State* v. *Gomez,* 225 Conn. 347, 354, 622 A.2d 1014 (1993). "Patently nonconstitutional claims that are unpreserved at trial do not warrant special consideration simply because they bear a constitutional label." *State* v. *Golding,* supra, 240. The defendant cannot prevail under *Golding.*

The judgment is affirmed.

In this opinion the other justices concurred.