THE STATE OF WASHINGTON, *Respondent*, v. MARY C. WALTERS, *Appellant*.

*Gerry A. Reitsch* (of *Klingberg, Houston, Reitsch, Cross & Frey*), for appellant.

*Henry R. Dunn, Prosecuting Attorney*, and *C. C. Bridgewater, Jr., Deputy*, for respondent.

PETRIE, J.—The defendant, a recipient of a public assistance grant under the program for aid to families with

dependent children, was convicted by jury verdict of the crime of grand larceny as defined by RCW 74.08.331. From denial of alternative motions in arrest of judgment or new trial, she has appealed to this court.

RCW 74.08.331 defines the crime of "grand larceny", in part, in these words:

> Any person who by means of a wilfully false statement, or representation, or impersonation, or a wilful *failure to reveal any material fact,* condition or circumstance affecting eligibility of [or] need for assistance, including medical care, surplus commodities and food stamps, as required by law, or a wilful *failure to promptly notify* the county office in writing as required by law or [of] *any change in status* in respect to resources, or income, or need, or family composition, money contribution and other support, from whatever source derived, or *any other change* in circumstances affecting his eligibility or need for assistance, or other fraudulent device, obtains, or attempts to obtain, or aids or abets any person to obtain any public assistance to which he is not entitled or greater public assistance than that to which he is justly entitled shall be guilty of grand larceny and upon conviction thereof shall be punished by imprisonment in the state penitentiary for not more than fifteen years.

(Italics ours.)

Our analysis of the issues presented by this appeal requires that we examine this statute in some detail. For the moment, however, we note that the gravamen of the statutory crime is obtaining (or attempting to obtain, or aiding or abetting another to obtain) public assistance to which one is not entitled (or greater public assistance than that to which one is justly entitled) "by means of" one or more of the statutorily condemned devices: (1) willfully false statement (or representation or impersonation); or (2) willful failure to reveal any material fact, condition or circumstance, affecting eligibility or need, as required by law; or (3) willful failure to promptly notify the depart-

ment as required by law of (A) any change in status in respect to resources, or income, or need, or family composition, etc., or (B) any other change in circumstances affecting eligibility or need for assistance; or (4) other fraudulent device.

The information, filed by the prosecuting attorney of Cowlitz County and as effectively amended at trial, charged that during the period from October, 1970 to July, 1971, Mrs. Walters did

> wilfully, unlawfully and feloniously, by means of a failure to reveal a material fact or a wilful failure to promptly notify the county office in writing of a change in family composition and income, to-wit: access to unreported resources, or any other change in circumstances affecting her eligibility or need for assistance, obtain public assistance in the amount of $973.50 to which she was not entitled or greater public assistance than that to which she was justly entitled; . . .

Thus, Mrs. Walters' crime, as alleged, was that she obtained public assistance by felonious omission to perform a positive duty—reveal a material fact or notify the then Department of Public Assistance of a change in her "family composition" and a change in her "access to unreported resources", or "other change in circumstances affecting her eligibility or need for assistance." The alleged criminal omissions, all somewhat intertwined, and as indicated by the evidence, really charged that some time during the 10-month period set forth in the information (1) an adult male person, James Pickett, with available income and resources, lived in Mrs. Walters' household in the role of an assumed spouse; and (2) she and James Pickett opened and became owners of funds deposited into a joint checking account—neither of which matters she revealed to, nor gave notice to, the local office of the administering agency.

Some of the facts are vigorously contested. However, there is sufficient evidence for the jury to have developed a picture somewhat as follows: On August 21, 1970, Mary Carol Walters appeared at the Kelso office of the then

Department of Public Assistance—and signed an eight page department form—asserting that she was applying for public assistance for herself and her four minor children. She left totally blank a space set aside for "Names of other persons living in the same house with me whether related or not." She reported that she was receiving unemployment compensation in the amount of $70 per week. She answered "Yes" to a question as to whether or not she owned or had a share in one or more of a series of generally described types of assets—but she failed to indicate an amount, ownership, or location of any type of asset, one of which was designated "checking account." She classified herself as "separated" from her husband who, other evidence indicated, is the adoptive father of the minor children. She signed her name to the form, below a statement printed on the form which declared, "I understand that it is my duty to report immediately to the local office of any changes in my income, resources, or living arrangements."

On February 19, 1971, and again on July 14, 1971, she filled out and signed an "Eligibility Review" form of the then Division of Public Assistance, Department of Social and Health Services. On each occasion she listed only herself and her four minor children in response to a printed request for "all members of my family (including myself) and other persons living in my house"—or "all persons (including myself) living in my home." On the February form she designated, as her only source to "receive money", the unemployment compensation benefit in the amount of $70 per week, but also declared that she had $24 "Money on hand or in the bank." On the July form she indicated that she had started to work on July 12, 1971, but left blank a space seeking "amount or value" of "Money on hand or in the bank."

During the period from November, 1970 through July, 1971, Mrs. Walters received assistance grants totaling $1,373.50, and turned over to the department the sum of $400, which she had received directly or indirectly as sup-

port payments from her separated (later divorced) husband.

On October 26, 1970, James R. Pickett and Carol Walters opened a joint checking account with right of survivorship, at the Bank of Cowlitz County, listing their address as one which Mrs. Walters had listed with the Division of Public Assistance. Mr. Pickett designated himself as being employed as a logger; the opening deposit was $60. During the following 10-month period, monthly deposit totals ranged from $612 to $1,140, including many, if not all, Mrs. Walters' $70 unemployment compensation checks. Mrs. Walters paid her rent and several other accounts with checks drawn upon this account.

On May 8, 1971, Mrs. Walters applied for a service permit from the Oregon Liquor Control Commission using the name Mary Carol Pickett. There is no indication in the record that James Pickett and Mary Carol Walters were ever married, but there is some indication that at least at one time they contemplated marriage. When he was in Longview Mr. Pickett spent a considerable portion of his time in Mrs. Walters' house—including overnight stays on at least several occasions.

Evidence in the record indicates that if Mrs. Walters had access to all the funds placed on deposit in the joint checking account she would not have been eligible for any assistance grant between November, 1970 and July, 1971. Evidence also indicates that if an adult person had been a member of the household, the department would have had to, but did not, determine his ability to contribute to the household. In any event, the jury could have believed that if the sixth person in the household was employed, the basic grant would have been reduced by $56.90 per month.

Without having said so in so many words, the theory of the prosecution is that an adult male person, not a member of the family, was in the household of the family which was receiving aid to families with dependent children; that the adult male person had income and resources of his own;

and therefore he was expected to contribute to the support of the family. Furthermore, the theory of the prosecution continues, the use of the assumptive spouse's resources and income, applied toward the reduction of the needs of the family unit, would have diminished Mrs. Walters' entitlement to public assistance. Under such a set of circumstances, the primary administrative regulation, determinative of whether or not the family's needs have been affected, is WAC 388-28-355, which at that[1] time provided in part:

(1) When a dependent child lives with his mother and an adult male person assuming the role of a spouse it is *expected* that the assumptive spouse *will contribute* to the support of the family. In order to determine the eligibility of the child *the mother must declare* the income and resources of the assumptive spouse and the amount of such income and resources which are provided for the support of the child and his mother. Such statement is signed by the assumptive spouse and mother.

(2) In determining if the assumptive spouse *is contributing a reasonable amount* to the family, WAC 388-28-560[2] shall be used as a *guide*. When the assumptive spouse is not contributing a reasonable amount toward the support of the family, a service worker *shall discuss* with him the necessity of such contribution.

(3) *Only such income and resources which are actually available from the assumptive spouse for current use on a regular basis shall be considered in determining the needs of the child.*

(Italics ours.)

There is some legislative foundation for an administrative regulation as WAC 388-28-355, short however of substantive imposition of a statutory duty upon an "assump-

---

[1]WAC 388-28-355(2) now provides: "(2) In determining if the assumptive spouse is contributing a reasonable amount to the family, WAC 388-28-560 shall be used as a guide. When the assumptive spouse is not contributing a reasonable amount toward the support of the family, a service worker shall discuss with him his *willingness* to make a reasonable contribution." (Italics ours.)

[2]The "guide" set forth in WAC 388-28-560 pertains to the allocation of income of a *parent* or *stepparent* for support of *legal* dependents.

tive spouse" to support the dependent children of his mistress, contained in chapter 282, Laws of 1969, 1st Ex. Sess., which appropriated almost one-half billion dollars to the then Department of Public Assistance for the 1969-71 biennium, and which also provided in part:

That where a *dependent child lives with his mother and* a stepfather or *an adult male person assuming the role of a spouse* to the mother although not legally married to her, the amount of the grant shall be computed after consideration is given to the income and resources of the stepfather or such adult male person and the State Department of Public Assistance shall determine if the stepfather or such adult male person is able to support the child either wholly or in part; said determination shall be based upon *a standard which takes into account* the stepfather's or *such adult male person's income, resources, and expenses* under regulations set forth by the Department of Public Assistance; . . .

(Italics ours.)

One more vital scene must be added to complete the appellate picture before we are in position to analyze the issues. In defining the elements of this crime, the jury was instructed:

To convict the defendant of the crime of Grand Larceny by Unlawfully Obtaining Public Assistance as alleged in the Information, you must be convinced by legal and competent evidence beyond a reasonable doubt that:

(1) During the period from November, 1970 to July, 1971, the defendant did wilfully, unlawfully and feloniously fail to reveal a material fact, to-wit:
    a. Access to resources;
        OR
    b. A change in family composition;
        OR
    c. Or any other change in circumstances affecting her eligibility or need for assistance;

(2) The defendant received public assistance:
    a. To which she was not entitled;
        OR
    b. Greater public assistance than that to which she was justly entitled;

(3) Said acts, transactions or omissions occurred in Cowlitz County, Washington;

If you find that the evidence admitted in this case proves Element 1, a *or* b *or* c, and Element 2, a *or* b, and Element 3, then it will be your duty to return a verdict of guilty of the crime of Unlawfully Obtaining Public Assistance.

We find that the trial court should have granted the defendant's motion in arrest of judgment for at least two reasons: (1) the information failed to charge a crime; and (2) the jury was permitted to return a verdict of guilty upon insufficient evidence. We do not reach, therefore, the defendant's primary assignment of error—that the statute unconstitutionally grants legislative authority to define the elements of a crime to an administrative agency. *See State v. Knowles,* 79 Wn.2d 835, 490 P.2d 113 (1971) for a determination that the statute is not unconstitutionally vague.

We have already set forth the four statutorily condemned devices "by means of" which a person subjects himself to criminal liability. The statute does not impose criminal liability upon one who merely obtains public assistance to which he is not entitled. Criminal liability follows only when one obtains public assistance by means of (1) a willfully false statement, (2) a willful failure to reveal what is *required by law* to be revealed, (3) a willful failure to promptly notify the department of those changes of which and in the manner the department is *required by law* to be notified, or (4) other fraudulent device. The statute is far from a model of clarity. Indeed, it bears technical deficiencies on its face. For purposes of this opinion we need not and do not explore the ramifications involved by reason of its statutory changes throughout the years. However, as to any criminal liability flowing from a willful omission to act, it is certainly clear that the statute presupposes the existence of an affirmative duty to reveal an existing fact, condition, or circumstance or to promptly notify the local office of the administering agency of any

change in status which affects one's eligibility or need for assistance.

■ Thus, when the prosecution charges that nonentitled public assistance was obtained by means of a failure to promptly notify the department of a change in status, it is necessary to allege (and prove) that the change was a change of which the defendant was required by law to give notice to the department. An allegation merely that the change in status affected eligibility or need is not sufficient unless the additional element—that the defendant was required by law to give notice—is also included in the information. Conceivably, the change would affect eligibility or need and yet it would not necessarily be the kind of change of which the defendant is required by law to notify the department.

To illustrate the distinction, we must refer to a statute which requires recipients to notify the department of certain changes. RCW 74.04.300 provides, in part:

> It shall be the duty of recipients of public assistance *to notify* the department within thirty days of the receipt or possession of *all income or resources* not previously declared to the department, and any failure to so report shall be prima facie evidence of fraud: . . .

(Italics ours.) The predecessor statute, RCW 74.08.300, which was repealed in 1957—and simultaneously replaced by RCW 74.04.300, *supra,* was more inclusive. It had provided:

> If, *at any time during the continuance* of public assistance, the recipient thereof becomes possessed of any property, resources or income in excess of the amount previously declared to the department, *it shall be the duty of the recipient to notify* the department within thirty days of the receipt or possession of such *property, income or resource.* Any assistance granted after the recipient has come into possession of such property, resource or income in excess of his need, and which was not reported within thirty days, may be deducted from subsequent assistance payments to the recipient or may

be recovered by the state department by a civil action instituted by the attorney general.

(Italics ours.) Section 34, chapter 174, Laws of 1953.

For reasons best known to itself, the legislature deliberately determined in 1957 that it would limit a recipient's *statutory* duty to notify the department solely to notification of the receipt or possession of income or resources not previously reported to the department. We know of no statutory requirement which would impose an affirmative duty upon a recipient to notify the department (in contrast to an affirmative duty to fully *reveal* the material facts at the time of application, reapplication, or review) that he (or she) has entered upon a meretricious relationship of questionable duration with another.

We have indicated, above, that the department had promulgated an administrative ruling, WAC 388-28-355, which required a mother of a dependent child to declare the income and resources of an assumptive spouse, which, in turn would provide a base from which it is *expected* the assumptive spouse will contribute to the family. However, the regulation contains its own reasonable limitations—that only those resources and income of the assumptive spouse which are actually available for current use on a regular basis shall be considered in determining the needs of the child. Accordingly, the regulation imposes an affirmative duty upon a mother of a dependent child, living with an assumptive spouse, to declare the income and resources of that assumptive spouse which are currently available for use on a regular basis. It does not, however, indicate that in all cases in which an assumptive spouse moves into the household, the mother has thereby received or become possessed of income or resources not previously reported to the department. The thrust of the distinction is not to condone Mrs. Walters' conduct in this case, but rather to point up the necessity for an allegation and proof by the prosecution that the change, which Mrs. Walters allegedly failed to notify the department of, was a change of which she was

"required by law" to give notice to the department. The information in the case at bench was fatally defective because it did not include an essential element of the crime charged. It failed to allege, in the words of the statute, that her criminal omission consisted of a failure to notify the department of a change of which she was "required by law" to notify the department. The information was fatally defective. *State v. Moser,* 41 Wn.2d 29, 246 P.2d 1101 (1952).

Notwithstanding that we have already set forth our reason for granting the defendant's motion in arrest of judgment based upon a fatally defective information, we deem it necessary—in view of the provisions of CrR 101.04W(d), to set forth additionally, that the motion should have been granted "because there was no proof of some element of the crime for which the defendant was tried."[3]

We note, preliminarily, that the "elements" instruction given to the jury was defective in that the jury was not required to find that the defendant received public assistance to which she was not entitled "by means of" one or more of the statutorily condemned devices. That defect, of course, would merely entitle Mrs. Walters to a new trial. *State v. Carter,* 4 Wn. App. 103, 480 P.2d 794 (1971). More significantly, however, we note that the jury was permitted to find Mrs. Walters guilty of having committed the crime in one or more of the alternative methods set forth in the first element of the instruction. This was quite appropriate in view of the allegations in the information. The difficulty arises, however, by reason of the fact that the jury was neither asked nor did they specify on which alternative method they found her guilty. Under such a state of the record, if there is a deficiency in the proof as to any one method, the verdict is deemed to have been founded upon

---

[3]CrR 101.04W(d) provides: "New Charges After Arrests of Judgments. When judgment is arrested in any cause and there is reasonable ground to believe that the defendant can be convicted of an offense properly charged, the court may order the defendant to be recommitted or admitted to bail anew to answer a new indictment or information: *Provided,* That, if judgment was arrested because there was no proof of some element of the crime for which the defendant was tried, the defendant shall be dismissed."

insufficient proof. *State v. Hutton,* 7 Wn. App. 726, 502 P.2d 1037 (1972).

We note also that the instruction appears to merge the alternative allegations of "failure to reveal" and the "failure to promptly notify" into simply a failure "to reveal a material fact, to-wit: a. Access to resources; OR b. A change in family composition; OR c. Or any other change in circumstances affecting her eligibility or need for assistance;". For purposes of this portion of this opinion we shall ignore any implications from a failure to distinguish between a duty to reveal and a duty to notify. (The legislative intent as to the nature of the distinction, if any, is not readily discernible.) Instead, we accept the instruction at face value and examine the evidence in support of each of the three alternatives set forth.

If the instruction had been confined only to Mrs. Walters' failure to reveal access to the joint bank account which she and Mr. Pickett opened in October, 1970—and in which sizeable deposits were thereafter made—we would find sufficient evidence to support the jury's verdict. Having established the joint nature of the bank account and its subsequent activity, the prosecution has presented sufficient evidence from which the jury could have determined that Mrs. Walters had access to the amounts deposited therein.

The change in "family composition", as set forth in the statute (RCW 74.08.331), could mean either a diminution of the family size, thus reducing the needs of the assistance unit, or an increase in the family size by the addition of someone with income or resources whose obligation was to support the other members of the assistance unit, thus also reducing the needs of the assistance unit. The term "family" as used herein is not defined by statute, but by regulation of the administering agency, the term "family unit" is defined as:

> "Family unit" means husband and wife, parent(s) or *persons standing in loco parentis* and minor children, or any combination thereof, living together and receiving assistance; husband and wife shall include a non-applying spouse.

(Italics ours.) WAC 388-22-030 (21).

■ Under no valid interpretation of the term can it be said that Mr. Pickett stood "in loco parentis" to Mrs. Walters' minor children. The relationship of *in loco parentis* becomes established only when a person intends to assume toward a child the status of a parent. *State ex rel. Gilroy v. Superior Court*, 37 Wn.2d 926, 226 P.2d 882 (1951). There was no indication in this record that Mr. Pickett had formed any intent to assume the status of parent to Mrs. Walters' minor children. Thus, if the jury rendered its verdict on the strength of the second alternative of the instruction, it was not supported by substantial evidence in the record.

We are even more disturbed by the implications contained in the third alternative—that Mrs. Walters failed to reveal "any other change in circumstances affecting her eligibility or need for assistance." Neither we nor the jury would have any valid idea what was really meant by that portion of the court's instruction. If the jury relied upon that alternative to return its verdict, the verdict must of necessity have been purely speculative in nature.

The judgment is reversed and this cause remanded with instruction to grant the defendant's motion in arrest of judgment.

PEARSON, C.J., and ARMSTRONG, J., concur.