

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 93119-4 |
| Respondent, | ) | |
| v. | ) | En Banc |
| DENNIS EARL ARMSTRONG, | ) | |
| Petitioner. | ) | Filed   MAY 1 1 2017 |

MADSEN, J.—In alternative means cases where substantial evidence supports both alternatives submitted to the jury, jury unanimity as to the means is not required. In this case, Dennis Armstrong asks us to reverse his felony domestic violence conviction for violating a court order because the trial court instructed the jury that it need not be unanimous as to which of the two means it relied on, so long as it was unanimous as to the conviction. Because this is a correct statement of the law, we find no error. Armstrong further contends that police violated his right to due process because they did not retrieve certain video surveillance tapes, but Armstrong has not shown the required bad faith. Thus, his due process claim fails. We affirm.

## FACTS

A no-contact order existed prohibiting Armstrong from contacting his former partner, Nadia Karavan. Nonetheless, on April 20, 2014, Karavan learned that

Armstrong was at a bus stop about a block away from where Karavan was staying. Because she had belongings that she wished to return to Armstrong, Karavan walked to the bus stop.

As the two talked, Armstrong became angry; according to Karavan, Armstrong yelled and hit the glass wall of the bus stop shelter. Armstrong then hit Karavan twice in the face with an open fist. After a brief struggle, Karavan ran to a nearby AMPM gas station, and Armstrong followed her. According to the store clerk, Todd Hawkins, the two exchanged words, Armstrong followed Karavan around the store for several minutes, and Karavan asked Hawkins to call the police several times. When Hawkins finally called the police, Armstrong left the store.

Three officers responded to the 911 call. Officers Quindelia Martin and Albert Elliot went to the AMPM and interviewed Karavan. Officer Martin noticed that Karavan had a slightly swollen, red abrasion on the side of her face. Officer Milton Rodrigue located Armstrong a block or two away from the AMPM. After Officer Elliot arrived, he and Officer Rodrigue interviewed Armstrong. The patrol car's camera captured the audio of the interview.

During the interview, Armstrong denied spending time inside the AMPM. In response, the officers told Armstrong that surveillance video from the AMPM would show what really happened. The officers repeatedly emphasized the video and told Armstrong that he should "tell the truth" because they had the "whole thing on video." At trial, Hawkins testified that there were about 16 cameras around the store: a few of

which covered the gas pumps and one that may have shown a slight, low view shot of the bus stop. Although Hawkins testified that police had requested surveillance video from AMPM in the past, no officer requested footage from the night of this incident. Hawkins had previously reviewed the video from that night and testified that it showed what he described in his testimony, but per AMPM policy, the video had since been destroyed.

At trial, the officers gave various reasons why they never collected the video. Officer Martin testified that she heard Officer Elliot ask about the video, but she assumed it was the responsibility of someone else at the scene to investigate the video. Officer Rodrigue testified that he never viewed the video. He simply followed Officer Elliot's lead when the two were questioning Armstrong. Officer Elliot was unavailable to testify at trial. Detective Rande Christiansen, who had been assigned to do the follow-up investigation on the case, testified that he did not investigate any video from the AMPM because he did not know such video existed.

The State charged Armstrong with a domestic violence felony violation of a court order. Clerk's Papers (CP) at 1; *see also* RCW 26.50.110. Before trial and again during trial, Armstrong moved to discharge his counsel. One of his reasons was that counsel failed to give him the surveillance video as he requested. The prosecutor told the court that the State had never possessed the video. The court denied Armstrong's motions.

Relevant to Armstrong's unanimity challenge, the court instructed the jury:

> To convict the defendant of the crime of violation of a court order, each of the following five elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about April 20, 2014, there existed a no-contact order applicable to the defendant;

(2) That the defendant knew of the existence of this order;

(3) That on or about said date, the defendant knowingly violated a provision of this order;

(4) That:

    (a) the defendant's conduct was an assault or

    (b) the defendant has twice been previously convicted for violating the provisions of a court order; and

(5) That the defendant's act occurred in the State of Washington.

If you find from the evidence that elements (1), (2), (3) and (5), and either of the alternative elements (4)(a), or (4)(b), have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. To return a verdict of guilty, the jury need not be unanimous as to which of alternatives (4)(a), or (4)(b), has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt.

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of the five elements, then it will be your duty to return a verdict of not guilty.

CP at 28-29. Armstrong did not object to this instruction. During closing argument, the prosecutor further explained this instruction:

The fourth element is in the alternative. So maybe everybody got this right away, but what this means is that there is [sic] two ways to commit this crime. . . .

    . . . .

    But the kind of secondary paragraph, the following paragraph that says, speaks about unanimity, so whether or not you have to be unanimous—that's a hard word to say—it's essentially instructing you that if six of you believe that: Hey look, we don't know if you've been twice previously convicted but we believe you assaulted her and six of you say: We think he's been twice previously convicted but we don't know if he assaulted her but we do believe he violated the no-contact order by going to her residence, then that's guilty. So you don't have to be unanimous as to which of the alternative means were present; you just have to be unanimous that all four of the elements have been satisfied.

Verbatim Report of Proceedings (July 31, 2014) at 17-18. Armstrong did not object to this argument.

4

The jury returned a general guilty verdict. The Court of Appeals affirmed the verdict in an unpublished opinion. *State v. Armstrong*, No. 72331-6-I, slip op. at 1 (Wash. Ct. App. Feb. 29, 2016) (unpublished), http://www.courts.wa.gov/opinions/pdf/723316.pdf. We granted Armstrong's petition for review, *State v. Armstrong*, 186 Wn.2d 1002, 380 P.3d 451 (2016), and we now affirm.

## ANALYSIS

### 1. Jury unanimity does not require unanimity on which alternative means the jury relies, so long as sufficient evidence supports each charged means

Armstrong argues that his right to a unanimous jury verdict was violated when the court instructed the jury that it did not have to be unanimous as to whether the conviction rested on two prior violations or an assault. Armstrong did not object to this instruction below, but we will consider error raised for first time on appeal when "giving or failure to give an instruction invades a fundamental constitutional right of the accused, such as the right to a jury trial." *State v. Green*, 94 Wn.2d 216, 231, 616 P.2d 628 (1980) (plurality opinion); *see also* RAP 2.5(a)(3) (party may raise a "manifest error affecting a constitutional right" for the first time on appeal). We review constitutional issues de novo. *State v. Jorgenson*, 179 Wn.2d 145, 150, 312 P.3d 960 (2013) (citing *State v. Sieyes*, 168 Wn.2d 276, 281, 255 P.2d 995 (2010)).

Criminal defendants have a right to a unanimous jury verdict in Washington. WASH. CONST. art. I, § 21;[1] *State v. Whitney*, 108 Wn.2d 506, 511, 739 P.2d 1150 (1987) (jury must unanimously conclude that the defendant committed the crime charged in the information). But in alternative means cases, where substantial evidence supports both alternative means submitted to the jury, unanimity as to the means is not required. *State v. Sandholm*, 184 Wn.2d 726, 732, 364 P.3d 87 (2015); *State v. Ortega-Martinez*, 124 Wn.2d 702, 705, 881 P.2d 231 (1994); *see also Whitney*, 108 Wn.2d at 508 ("In *Arndt*, we held that if substantial evidence supports each of the alternate means of committing the single crime charged, and the alternate means are not repugnant to one another, jury unanimity as to the mode of commission is not required" (citing *State v. Arndt*, 87 Wn.2d 374, 376-77, 553 P.2d 1328 (1976))); *State v. Franco*, 96 Wn.2d 816, 823, 639 P.2d 1320 (1982) (citing *Arndt*, 87 Wn.2d at 377-78), *abrogated on other grounds by State v. Sandholm*, 184 Wn.2d 726, 736, 364 P.3d 87 (2015). For more than 75 years, we have upheld unanimous jury verdicts based on alternative means where the jury did not specify which alternative provided the basis for the verdict. *See State v. Stuhr*, 1 Wn.2d 521, 529, 96 P.2d 479 (1939) (citing *State v. Talbott*, 199 Wash. 431, 91 P.2d 1020 (1939)). This case presents a straightforward application of those principles.[2]

---

[1] The Sixth Amendment to the federal constitution does not require jury unanimity in state court criminal trials. *Apodaca v. Oregon*, 406 U.S. 404, 406, 92 S. Ct. 1628, 32 L. Ed. 2d 184 (1972).

[2] For this court to reject our previous holdings, the party seeking that rejection must show that the established rule is incorrect and harmful or a prior decision is so problematic that we must reject it. *State v. Otton*, 185 Wn.2d 673, 678, 374 P.3d 1108 (2016).

An alternative means crime is one where the legislature has provided that the State may prove the proscribed criminal conduct in a variety of ways. *State v. Peterson*, 168 Wn.2d 763, 769, 230 P.3d 588 (2010) (quoting *State v. Smith*, 159 Wn.2d 778, 784, 154 P.3d 873 (2007)). In this case, the State charged Armstrong with domestic violence felony violation of a court order. CP at 1-2; RCW 26.50.110. Although generally a gross misdemeanor, a violation of RCW 26.50.110 is a class C felony if committed in either of two ways: (1) the violation of the order is also an assault or (2) the offender has at least two previous convictions for violating a protection order. RCW 26.50.110(4), (5). The parties agree that a felony violation of a court order is an alternative means crime.[3]

Sufficient evidence is that which justifies a rational trier of fact finding guilt beyond a reasonable doubt. *Ortega-Martinez*, 124 Wn.2d at 708 (citing *Green*, 94 Wn.2d at 220 (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979))). "The evidence is sufficient if 'after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt'." *Id.* (quoting *State v. Rempel*, 114 Wn.2d 77, 82, 785 P.2d 1134 (1990)). Here, Armstrong does not argue that there was insufficient evidence to support both alternative means. Nor could he.

As to the means of assault, Karavan testified that Armstrong struck her twice in the face with an open fist. Responding officers corroborated this claim, testifying that Karavan had red abrasions on her face. As to the means of two prior violations,

---

[3] Suppl. Br. of Pet'r at 4-6; Suppl. Br. of Resp't at 6; *see also Armstrong*, slip op. at 4.

Detective Christiansen testified that Armstrong had two previous convictions for violating a court order, and the court admitted the judgment and sentences from those convictions as exhibits. Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found guilt beyond a reasonable doubt for both alternative means, which Armstrong does not dispute.

Armstrong does not argue that there was insufficient evidence on either of the charged means. Rather, he asserts that sufficient evidence cannot be a basis to affirm in this particular case because the court committed affirmative constitutional error by instructing the jury that it need not be unanimous. Armstrong bases his argument that unanimity as to each charged means is required on this court's language in *Ortega-Martinez*, 124 Wn.2d at 708. In dicta, the court said, "In certain situations, the right to a unanimous jury trial also includes the right to express jury unanimity on the *means* by which the defendant is found to have committed the crime." *Id.* at 707. The court suggested that the lack of express unanimity is acceptable in other cases because that unanimity is "infer[red]" by the reviewing court. *Id.* at 707-08.[4] This language, however, was both unnecessary to the holding in *Ortega-Martinez* and unsupported by the cases it cited.

---

[4] We have repeated this language from *Ortega-Martinez* subsequently. *See State v. Randhawa*, 133 Wn.2d 67, 74, 941 P.2d 661 (1997); *State v. Owens*, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014). But in neither case did the holding rely on the language in *Ortega-Martinez*, and no case has established a right to unanimity as to means where sufficient evidence supported both alternatives.

In *Ortega-Martinez*, the court held, consistent with long-settled case law, that jury unanimity as to the means by which Ortega-Martinez committed the crime was not required because sufficient evidence supported both means. *Id.* at 705. Thus, any discussion about when unanimity might be required as to each means was unnecessary. Further, the cases cited for the proposition that unanimity as to means might be required in certain situations or is "inferred" do not support such a statement. First, the majority cited *Green*, 94 Wn.2d 216. But in that case, the court found insufficient evidence to support one of the means. In such a circumstance, the court had no assurance that the jury rested its verdict on a valid means. *Id.* at 233. And any dicta in *Green* to support the proposition that unanimity would be required in "other situations," such as if the alternative means were distinct crimes, was disavowed in *Whitney*, 108 Wn.2d at 511.

The *Ortega-Martinez* majority also cited *Whitney*. But that case also emphasized that jury unanimity as to means is not required so long as sufficient evidence supports each alternative. *Id.* *Whitney* explained that when "constitutionally sufficient evidence supports both charged alternatives, the lack of jury unanimity does not entail the danger . . . that any of the jury members may have based their finding of guilt on an invalid ground." *Id.* Finally, the *Ortega-Martinez* majority cited *Franco*, 96 Wn.2d 816. That case too reiterated that where a single offense can be committed in more than one way, the constitution requires jury unanimity only as to guilt of the crime charged, so long as there is substantial evidence to support each charged alternative. *Id.* at 823. These cases simply do not support the notion that we *infer* jury unanimity for alternative means

crimes because they all correctly state that such unanimity is not required. We would not infer that which we do not require.

Consistent with *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), the State must prove the essential elements of the crime charged beyond a reasonable doubt. *Jackson*, 443 U.S. at 318-19. When a defendant challenges a conviction for sufficiency, a reviewing court considers whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Id.* at 319. Similarly, the right to jury unanimity requires that each member of the jury find that the State has proved each element beyond a reasonable doubt. When one element of the crime can be satisfied by alternative means, jury unanimity is satisfied if the jury unanimously agrees the State proved that element beyond a reasonable doubt and the evidence was sufficient for each alternative means of committing that element.

When there is insufficient evidence to support one of the alternative means charged and the jury does not specify that it unanimously agreed on the other alternative, we are faced with the danger that the jury rested its verdict on an invalid ground. In those situations, the conviction cannot stand. Thus, as we have said before, an instruction on jury unanimity as to the alternative method found is preferable. *Whitney*, 108 Wn.2d at 511. Giving such an instruction eliminates potential problems that may arise when sufficient evidence does not support one of the alternatives. *Id.* But an instruction being

preferable does not make it a requirement. Because sufficient evidence supported the alternative means in this case, Armstrong's right to jury unanimity was preserved.

> 2. Due process is not violated when the police fail to preserve potentially useful evidence in the absence of showing that they acted in bad faith

Armstrong next claims that the police violated his right to due process because they failed to collect video surveillance from the AMPM after using that video as a tool when interviewing Armstrong at the scene. Under the Fourteenth Amendment to the federal constitution, criminal prosecutions must conform with prevailing notions of fundamental fairness, and criminal defendants must have a meaningful opportunity to present a complete defense. *State v. Wittenbarger*, 124 Wn.2d 467, 474-75, 880 P.2d 517 (1994) (citing *California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)). "To comport with due process, the prosecution has a duty to disclose material exculpatory evidence to the defense and a related duty to preserve such evidence for use by the defense." *Id.* at 475 (citing *Brady v. Maryland*, 373, U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)). The state due process clause extends the same protection regarding this right as does its federal counterpart. *Id.* at 474; *see also State v. Ortiz*, 119 Wn.2d 294, 305, 831 P.2d 1060 (1992) (*Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), provides the proper standard for the preservation of exculpatory evidence), *overruled on other grounds by State v. Condon*, 182 Wn.2d 307, 343 P.3d 357 (2015).

Although the State is required to preserve all potentially material and favorable evidence, this rule does not require police to search for exculpatory evidence. *State v.*

*Judge*, 100 Wn.2d 706, 717, 675 P.2d 219 (1984). The United States Supreme Court has thus been unwilling to impose on police "'an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.'" *Wittenbarger*, 124 Wn.2d at 475 (quoting *Youngblood*, 488 U.S. at 58).

To be material exculpatory evidence, "the evidence must both possess an exculpatory value that was apparent before it was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Trombetta*, 467 U.S. at 489). For "'potentially useful' evidence," on the other hand, failure to preserve by the police is not a denial of due process unless the suspect can show bad faith by the State. *Id.* at 477 (quoting *Youngblood*, 488 U.S. at 58); *see also Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003) (citing *Youngblood*, 488 U.S. at 58); *Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989).

"'The presence or absence of bad faith . . . turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'" *Cunningham*, 345 F.3d at 812 (alterations in original) (quoting *Youngblood*, 488 U.S. at 57). Acting in compliance with its established policy regarding the evidence at issue is determinative of the State's good faith. *Wittenbarger*, 124 Wn.2d at 477 (citing *Ortiz*, 119 Wn.2d at 302). A plaintiff must "put forward specific, nonconclusory factual allegations that establish

improper motive." *Cunningham*, 345 F.3d at 812 (quoting *Jeffers v. Gomez*, 267 F.3d 895, 907 (9th Cir. 2001)).

Armstrong asserts that the video surveillance was potentially useful evidence. Therefore, he must show that the police acted in bad faith. According to Armstrong, the police acted in bad faith because they told him during the interview that they were going to collect the video but they never actually collected it. Armstrong describes this as the police acting with an "extreme cavalier attitude" toward preserving potentially useful evidence. Beyond this failure to collect the video, Armstrong offers no evidence of bad faith, such as improper motive. *See Whittenbarger*, 124 Wn.2d at 478.

Armstrong has failed to show that the police acted in bad faith when they failed to collect the surveillance video from the AMPM. The testimony of the officers indicates that the video went uncollected due to mere oversight. Armstrong has presented no evidence that the police had an improper motive. At most, Armstrong has shown that the investigation was incomplete or perhaps negligently conducted, but that is not enough to show bad faith. Further, although Hawkins testified that police had requested surveillance video in the past, Armstrong has presented no evidence that police acted in violation of an established policy. He, in fact, concedes that no written policy required the police to collect the video.

This result is consistent with the Ninth Circuit's application of the *Youngblood* bad faith standard. In *Cunningham*, the Ninth Circuit found that the police officer's failure to collect physical evidence, such as bed sheets or clothing, was not in bad faith. 345 F.3d

13

at 812. In reaching that conclusion, the court emphasized that the value of untested evidence is speculative, and while the officer's investigation may have been negligent or incomplete, it was not done in bad faith. *Id.* The court compared Cunningham's claim to that in *Miller*, where the plaintiff had shown bad faith. *Id.* (citing *Miller*, 868 F.2d 1116). In that case, the officer referred to the plaintiff using an expletive, lied about his knowledge of the potentially exculpatory evidence, and tried to dissuade witnesses from testifying in favor of the plaintiff. *Id.* (citing *Miller*, 868 F.2d at 1121). The failure of the officer in *Cunningham* to collect physical evidence did not rise to that level of bad faith. Similarly, Armstrong has failed to show that police acted in bad faith here when they did not collect the surveillance video.

## CONCLUSION

We have held for more than 75 years that jury unanimity as to means is not required in alternative means cases where substantial evidence supports both alternatives. Armstrong's case is a straightforward application of this long-standing principle. Further, Armstrong has failed to show that the police acted in bad faith when they did not collect video surveillance that was only potentially useful evidence. Finding no error, we affirm Armstrong's conviction.

14

No. 93119-4

_Madsen, J._

WE CONCUR:

_Fairhurst, J._

_González, J._

No. 93119-4

GORDON McCLOUD, J. (dissenting)—The majority is correct that this court does not require jury unanimity as to "alternative means," so long as there is sufficient evidence to support each of the means alleged. Majority at 6. The majority is also correct that Dennis Armstrong concedes he was charged with an alternative means crime—in other words, he agrees that violating a protection order (1) through conduct that "is also an assault" *or* (2) while having "at least two previous convictions for violating a protection order" are just two alternative means of committing a single felony offense. *Id.* at 7 (citing RCW 26.50.110(4), (5)). And if this concession were proper, I would join the majority's analysis in full. The majority properly rejects Armstrong's argument that his state article I, section 21 constitutional protections were violated because the jury may have been nonunanimous as to means. CONST. art. I, § 21. Where sufficient evidence supports each alternative means alleged, as it did in Armstrong's case, such unanimity is not required.

I respectfully dissent, however, because I do not believe that this an alternative means case.

In a true alternative means case, the prosecution pleads alternatives that all support one fundamentally coherent theory of a crime. A typical example is a case where the prosecution charges intentional and felony murder in the alternative, and argues that the defendant killed the victim *either* with premeditation in order to obtain money in a robbery *or* incidentally in the course of a robbery. *E.g.*, *State v. Fortune*, 128 Wn.2d 464, 466-67, 909 P.2d 930 (1996) (evidence showed defendant beat victim to death with sledgehammer and later used victim's bank card to empty victim's account). Another is a rape prosecution alleging that the defendant used *either* the threat of force *or* actual force to compel sexual intercourse. *E.g.*, *State v. Tucker*, 226 Conn. 618, 644-50, 629 A.2d 1067 (1993) (evidence showed defendant forced victim to have sex by punching her, choking her, and threatening her with death, all in the course of single transaction). In such cases, the jury can split as to the precise means the defendant used to accomplish the crime (premeditated intent to kill *or* rob; threat *or* use of force), while still agreeing on the bottom line—i.e., that the defendant killed the victim with a requisite mental state or compelled the victim to have nonconsensual sex.

2

This case is different. The evidence supporting each alleged means is entirely distinct because the two means alleged constitute entirely different theories of the State's case. According to one theory, Armstrong committed an assault at the time of the charged violation. This theory depended on the victim's testimony that Armstrong hit her and testimony by responding officers that the victim had abrasions on her face when they arrived at the scene. Majority at 7. According to the other theory, Armstrong had specific prior convictions at the time of the charged violation. This theory depended on testimony and written documentation regarding Armstrong's criminal history. *Id.* at 7-8. A jury that splits on these means does not agree on a fundamentally coherent theory of the crime. If the right to a unanimous jury verdict is to have any meaning at all, it must protect against that outcome—both this court and the United States Supreme Court have recognized as much.

I would therefore reject Armstrong's concession[1] that this is an alternative means case that is controlled by our existing precedent on article I, section 21 of the Washington Constitution. Instead, I would call for briefing on a different question: whether Armstrong's conviction must be reversed under state or federal law

---

[1] *See State v. Coley*, 180 Wn.2d 543, 557 n.3, 326 P.3d 702 (2014) (rejecting State's concession on dispositive burden of proof issue).

addressing "alternative acts" (also called "alternative crimes") as opposed to "alternative means."

ANALYSIS

This case requires us to interpret a statute, RCW 26.50.110(4) and (5), that describes two prohibited acts. That statute formed the basis for the jury instructions in this case, which allowed the jury to convict Armstrong of a single felony even if they disagreed about which of those two acts he committed. Majority at 4, 7.

In an analogous context, the United States Supreme Court has recognized that when a jury instruction describes various alternative acts, treating them as different (specific) ways of committing the same (general) crime, it poses a risk to due process. *Richardson v. United States*, 526 U.S. 813, 819, 119 S. Ct. 1707, 143 L. Ed. 2d 985 (1999); U.S. CONST. amend. XIV. Specifically, it poses the risk that jurors, unless instructed otherwise, will convict not because they unanimously find that the defendant committed any of the *particular* acts alleged, but because they agree the defendant must be guilty of *something*—as the Court put it, "That where there is smoke there must be fire." *Richardson*, 526 U.S. at 819. That risk does not violate Fourteenth Amendment due process protections when the alternative acts alleged relate to "mere means" of committing a crime. *Schad v. Arizona*, 501 U.S. 624, 636-39, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991) (plurality opinion); U.S.

4

CONST. amend. XIV. But when those facts relate to actual "elements" of the crime, a conviction cannot stand unless the jury unanimously agrees that the prosecution has proved those facts beyond a reasonable doubt. *Schad*, 501 U.S. at 636-39.

While legislatures have the authority to define crimes and their constituent elements, this authority is not unlimited. *Id.* at 638. At some point, alternative theories of a crime become so different from one another that—regardless of legislative intent—they must be treated as different elements necessary to conviction, as to which a jury must be unanimous. *Id.* at 633 (plurality opinion) ("nothing in our history suggests that the Due Process Clause[, U.S. CONST. amend. VI,] would permit a State to convict anyone under a charge of 'Crime' so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction."), 650 (Scalia, J., concurring in part and concurring in judgment) ("one can conceive of novel 'umbrella' crimes (a felony consisting of either robbery or failing to file a tax return) where permitting a 6-to-6 verdict would seem contrary to due process"). Thus, the United States Supreme Court has articulated a two-part inquiry for determining whether a factual allegation underlying a criminal charge is a "mere means" or a true element defining a different crime. First, which did the legislature intend? Second, if the legislature intended to create "mere means" (as to which the

5

jury need not be unanimous), does this satisfy due process requirements? *Richardson*, 526 U.S. at 818-20. If the answer to either question is no, then the right to jury unanimity attaches. *Id.*[2]

This court has also addressed the distinction between "alternative means"—as to which a jury need not be unanimous—and alternative elements defining "alternative crimes"—as to which a jury must be unanimous. *State v. Arndt*, 87 Wn.2d 374, 553 P.2d 1328 (1976). Although we addressed this distinction under our state constitution, instead of the federal due process clause[3] (and although we discussed it as primarily a question of legislative intent),[4] we drew a line similar to

---

[2] In the context of the jury unanimity right, the United States Supreme Court has never found a conflict between the first and second questions—that is, it has never found a statute unconstitutional because it treated true elements as "mere means." However, that Court has relied on the canon of constitutional avoidance to conclude that Congress intended to create elements as opposed to means. In *Richardson*, the Court interpreted the federal "'continuing criminal enterprise' (CCE)" "statute's phrase 'series of violations' [to] . . . create several *elements*," such that the jury had to be unanimous as to which alleged CCE "violations" in fact occurred. 526 U.S. at 815, 817-18; 21 U.S.C. § 848(c). The Court reasoned that "[t]he CCE statute's breadth"—that is, the wide variety of behaviors it defined as "violations"—would create due process concerns if these distinct violations were treated "simply as alternative means." *Richardson*, 526 U.S. at 819. It therefore held that each violation was an element, concluding that there was no evidence Congress intended the statute to "test . . . constitutional limits." *Id.* at 820.

[3] *Arndt*, 87 Wn.2d at 377 (citing *State v. Carothers*, 9 Wn. App. 691, 694 n.2, 514 P.2d 170 (1973)).

[4] *Id.* at 378 ("How can it be determined if RCW 74.08.331 describes a single offense committable in more than one way, or describes multiple offenses? What must be ascertained is the legislature's intent . . . .").

6

the United States Supreme Court's. We held that a statute creates alternative crimes, triggering the right to a unanimous jury, when the alternatives it lists are inherently discrete and disconnected. *Id.* at 379.

To determine whether that condition was met, we considered three factors relating to the nature of the acts prohibited under a statute: "'[(1)] whether there is a readily perceivable connection between the various acts set forth [in the statute]; [(2)] whether the acts are consistent with and not repugnant to one another; [(3)] and whether the acts may inhere in the same transaction.'" *Id.* (quoting *State v. Kosanke*, 23 Wn.2d 211, 213, 160 P.2d 541 (1945)).

Applying those factors, we have held that kidnapping and use of a deadly weapon are alternative means of committing first degree rape because they "'could inhere in the same incident,'" simultaneously serving the single purpose of accomplishing the rape. *State v. Whitney*, 108 Wn.2d 506, 510-11, 739 P.2d 1150 (1987) (quoting *State v. Whitney*, 44 Wn. App. 17, 25, 720 P.2d 853 (1986)). We reached a similar conclusion about the various "'fraudulent device[s]'" prohibited in RCW 74.08.331, a statute criminalizing the "'obtaining . . . [of] public assistance to which one is not entitled . . . "by means of" . . . (1) willfully false statement . . . ; (2) willful failure to reveal any material fact . . . ; [or] (3) willful failure to promptly notify the department as required by law of . . . any . . . change in circumstances

7

affecting eligibility or need for assistance. . . .'" *Arndt*, 87 Wn.2d at 381 (quoting

*State v. Walters*, 8 Wn. App. 706, 707-08, 508 P.2d 1390 (1973)). We reasoned that

these were all "closely related, connected acts" that may "inhere in the same

transaction." *Id.* at 382-84 (italics omitted).

By contrast, we have said that an ordinance creates alternative crimes, as

opposed to mere alternative "means," by making it unlawful to

> "manufacture, sell, barter, exchange, give away, furnish or otherwise
> dispose of any intoxicating liquor; or to buy, receive or keep any
> intoxicating liquor with intent to sell, barter, exchange, give away, use,
> furnish, or otherwise dispose of the same; or to buy, accept or receive
> the same; or . . . to . . . possess[] more than [certain specified amounts
> of liquor]."

*Id.* at 382 (quoting *City of Seattle v. Molin*, 99 Wash. 210, 213, 169 P. 318 (1917)).

We explained that this ordinance prohibited "a number of disconnected,

independent, and miscellaneous acts which could not constitute a single offense."

*Id.*

These cases produce the following rule: acts listed in a single statute may be

treated as alternative means on which the jury need not be unanimous (as opposed

to alternative crimes on which the jury must be unanimous) only where a juror can

logically determine beyond a reasonable doubt that the defendant committed the

general crime charged, without also determining which of several acts he or she did

to commit that general crime. In other words, the constitution does not demand jury unanimity as to means when those means differ as to preliminary factual issues but do not differ as to the bottom line definition of the crime.[5] On the other hand, where those alternatives really describe different bottom line crimes—where a juror cannot determine that the defendant in *fact* committed the crime charged without also

---

[5] *See Schad*, 501 U.S. at 631-32 ("'different jurors may be persuaded by different pieces of evidence, even when they agree on the bottom line [and] . . . there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict'" (quoting *McKoy v. North Carolina*, 494 U.S. 433, 449, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990) (Blackmun, J., concurring))), 650 (Scalia, J., concurring in part and concurring in the judgment) ("When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believed he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believed he left her unconscious and set the fire to kill her."); *Tucker*, 226 Conn. at 644-50 (sexual assault statute prohibiting sexual intercourse accomplished by either threat or use of force described alternative means, not alternative crimes or elements, where evidence showed defendant forced victim to have sex by punching her, choking her, and threatening her with death, all in the course of single transaction; under those facts, "the two methods of compulsion are not conceptually distinct"); *State v. Johnson*, 46 Ohio St. 3d 96, 105, 545 N.E.2d 636 (1989) (assuming jury split on question of whether defendant murdered victim while attempting a robbery, completing a robbery, or fleeing an attempted or completed robbery, "each juror still would have agreed that [he] had murdered [the victim] in conjunction with at least attempting to commit aggravated robbery, and this alone would have been adequate to sustain the conviction"), *overruled in part on other grounds by State v. Jenks*, 61 Ohio St. 3d 259, 282, 574 N.E.2d 492 (1991); *State v. James*, 698 P.2d 1161, 1167 (Alaska 1985) (jury unanimity right is not violated where "case . . . does not present a situation in which jurors might have split over whether the defendant committed a single criminal act"; thus, where statute defined first degree assault as committable by either intent or extreme indifference, jury need not agree as to mental state underlying sole alleged act).

9

determining *how* he or she committed it—the constitution requires unanimity as to this "how."[6]

Obviously, this is not always an easy line to draw. We know that certain conduct (e.g., different ways of committing a rape, *Tucker*, 226 Conn. at 644-50; *Whitney*, 108 Wn.2d at 510-11; or murder, *Fortune*, 128 Wn.2d at 467; *Schad*, 501 U.S. at 631-32) clearly fit into the first category. *See also supra* note 5 above. But I believe that this case falls into the second category. The two modes of commission alleged in this case—violation of a no contact order via a contemporaneous assault versus violation of a no contact order even in a peaceful manner but following a history of similar prior convictions—support two fundamentally distinct descriptions of what occurred. One describes the severity of the current conduct. The other does not; it describes the defendant's status. As a practical matter, this situation is more like a "multiple acts" case—in which the government alleges

---

[6] *United States v. Gipson*, 553 F.2d 453, 457-58 (5th Cir. 1977) (the right to a unanimous jury is meaningless unless it guarantees "substantial agreement as to just what a defendant did"; defendant therefore entitled to jury unanimity as to means of committing offense that are too conceptually distinct to inhere in the same act); *State v. Boots*, 308 Or. 371, 374-75, 780 P.2d 725 (1989) (defendant entitled to unanimity instruction where state alleged that murder occurred either in furtherance of first degree robbery or to conceal identity of robbery's perpetrators; failure to give instruction "relieves the jury from seriously confronting the question whether they agree that any factual requirement of aggravated murder has been proved beyond a reasonable doubt").

multiple, different criminal acts occurring at distinct times[7]—and this court has long required express jury unanimity in such multiple acts cases.[8]

## CONCLUSION

The State advanced two fundamentally different theories of guilt in this case. By allowing the jury to convict even if it did not agree on which theory the State actually proved, the jury instructions jeopardized constitutional protections. They posed the risk that the jury would convict not because it agreed that Armstrong committed a particular criminal act, but instead because it agreed that he must be guilty of something—"that where there is smoke there must be fire." *Richardson*, 526 U.S. at 819. Armstrong challenged the legality of his conviction because of the

---

[7] *See State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988) (when State fails to elect which of several alleged acts it intends to rely on for conviction, there is constitutional error "stem[ming] from the possibility that some jurors may have relied on one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction"), *abrogated in part on other grounds by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 316 P.3d 1007 (2014); *United States v. Beros*, 833 F.2d 455, 460-61 (3d Cir. 1987) (*Gipson*'s reasoning—that unanimity right is meaningless unless "'jurors [are in] substantial agreement as to just what a defendant did'"—applies with equal force where single criminal charge alleges "several transactions or occurrences, any of which could constitute one of the acts proscribed by the charged statutes" (quoting *Gipson*, 553 F.2d at 457-58)).

[8] *See State v. Carson*, 184 Wn.2d 207, 227, 357 P.3d 1064 (2015) (where State fails to elect which of several distinct criminal acts it will rely on for conviction, defendant is entitled to jury unanimity instruction as to underlying act (citing *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984)).

11

lack of jury unanimity on the State's theory. But he did not raise the specific "alternative crimes" argument addressed here, so the State has not had the opportunity to address it. I would therefore call for briefing on the "alternative crimes" issue, including whether any error was harmless in this case. For all of these reasons, I respectfully dissent.

_Gordon McCloud, J._

_Wiggins, J._

_Stephens, J._